UNITED STATES of America

v.

**The SPY FACTORY, INC. d/b/a "Spy Factory," Ronald Kimball, Marlin Richardson, a/k/a "Brud," and Tracy Edward Ford, Defendants.**

No. S1 95 cr 737 (SS).

United States District Court,
S.D. New York.

Jan. 8, 1997.

Lefcourt & Dratel, P.C., New York City (Gerald B. Lefcourt, Joshua L. Dratel, Gary G. Becker, of counsel), for Defendant, The Spy Factory, Inc.

Goldstein, Goldstein & Hiley, San Antonio, TX, (Gerald H. Goldstein, Patrick T. Peranteau, of counsel), Robert Fogelnest, New York City, for Defendant, Ronald Kimball.

Ronald Ederer, San Antonio, TX, Marvin Schecter, New York City, for Defendant, Marlin Richardson.

Robert O. Switzer, San Antonio, TX, Ruth M. Leibesman, New York City, Roger Bennet Adler, CJA Attorney, New York City, for Defendant, Tracy Ford.

U.S. Department of Justice, United States Attorney, Southern District of New York, New York City, Daniel J. Fetterman, Thomas C. Rubin, Assistant United States Attorneys, for U.S.

## AMENDED OPINION AND ORDER

SOTOMAYOR, District Judge.

Defendants move, pursuant to Fed. R.Crim.P. 21(b), to change the venue of this action from the Southern District of New

York to the Western District of Texas. Further, defendants move to dismiss a portion of Count 1, as well as Counts 2 through 16 and 17 through 31 of the Indictment on the ground that the statute upon which the prosecution of these counts is based, 18 U.S.C. § 2512, is unconstitutionally vague. For the reasons to be discussed, defendants' motions are **DENIED.**

## BACKGROUND

The Spy Factory "is a retail store concept developed in 1989 to sell personal protection devices and personal security items to the general public and law enforcement agencies." (Defs.' Vagueness Mem. at 3) [1]. "At the time of the initial searches and arrests in this case, Spy Factory, which is headquartered in Texas, had 16 stores located throughout the United States." (*Id.*).

"In 1993, the United States Customs Service ... began an investigation of illegal bugging and wiretapping devices that were imported into the United States and sold by various so-called 'spy shops.'" (Govt Mem. at 2). According to the Government, "Spy Factory was and is the largest chain of retail 'spy shops' in the country." (*Id.*) Working across the country, but centralizing its efforts in New York City, the Government used undercover agents and confidential informants to gather evidence to prosecute the Spy Factory and the individually-named defendants for "violations of customs laws, Section 2512 of Title III, and the Communications Act of 1934." (Govt Mem. at 4).

"On August 16, 1995, a grand jury sitting in the Southern District of New York returned an eight-count indictment ... charging Spy Factory, its owner, Ronald Kimball, its general manager, Marlin Richardson, a/k/a 'Brud,' and its deputy general manager, Tracy Edward Ford, with a conspiracy to smuggle and sell illegal bugging and wiretapping devices...." (Govt Mem. at 4). On June 12, 1996, a grand jury returned a 70–count superseding indictment adding to the original indictment "several objects to the conspiracy, and additional substantive violations of Title 18, United States Code, Sections 2512(1)(a), 2512(1)(b), and 545 relating to numerous sales of illegal bugging and wiretapping devices from the Southern District of New York." (*Id.*) The indictment also included "a conspiracy and substantive counts of money laundering." (*Id.*).

On June 14, 1996, the Honorable Milton Pollack, then acting as Part One Judge of this District, signed an *ex parte* restraining order that put the assets of Spy Factory "under the control of a special monitor from the accounting firm of KPMG Peat Marwick, LLP, who oversees and controls expenditures of funds, including expenditures for legal expenses in this case." (Defs.' Venue Mem. at 14). "Under the terms of the Restraining Order ... and related letter agreement ... dated August 28, 1996, ... the corporation is limited to $2,000.00 per month for the payment of legal expenses." (Defs.' Venue Mem. at 14).

On September 16, 1996, less than four months before the scheduled trial date of January 14, 1997, and approximately one year after the first pre-trial conference in this action, the defendants filed their pretrial motions in this action. The defendants moved, *inter alia,* for a change of venue from the Southern District of New York to the Western District of Texas, where Spy Factory is headquartered and where all the defendants and most of the defense witnesses reside. The defendants claim that trial in New York is beyond the means of at least two of the defendants to afford and that

---

1. The defendants and the Government agreed to file their pretrial motions together. Defendants, however, submitted separate memoranda of law addressing the various issues raised in their pretrial motions. One memorandum of law, entitled "Memorandum of Law in Support of Defendant the Spy Factory, Inc.'s Pre–Trial Motions," addressed the constitutionality of Section 2512. It will hereinafter be referred to as "Defs.' Vagueness Mem." A separate memorandum of law, entitled "Defendants' Joint Motion for Change of Venue and Incorporated Memorandum of Law," addressed the motion for a change of venue and will hereinafter be referred to as "Defs.' Venue Mem." Finally, the defendants' remaining issues of law pertaining to suppression and discovery issues were briefed in a third memorandum of law which will hereinafter be referred to as "Defs.' Discovery Mem." The Government submitted one memorandum of law which addressed all of the defendants' pretrial motions. It will hereinafter be referred to as "Govt Mem."

forcing defendants and their counsel and witnesses to travel to, and be lodged in, New York, "one of the most expensive cities in the world," (Defs.' Venue Mem. at 4), would impose a tremendous financial burden upon them. Further, defendants insist that if they are forced to stand trial in the Southern District of New York, their businesses and employment in San Antonio would be seriously jeopardized. They contend that given these considerations, "the interests of justice" require that the trial be moved to San Antonio, Texas.

The Government counters that defendants unduly delayed their filing of the change of venue motion and that such delay should militate against the Court's granting of the motion. Furthermore, the Government argues that if the trial were transferred to Texas, not only would the Government incur significant financial expenses to move all its case-related materials and personnel out-of-state, but that the trial itself inevitably would be delayed so that local assistant United States attorneys in Texas could familiarize themselves with the intricacies of the case. With respect to the defendants' assertions that their businesses and employment prospects would suffer if they were tried in New York, the Government minimizes this argument by contending that "inconvenience and interference with normal occupational and personal activities occur whenever a defendant is involved in a trail [sic] facing serious charges." (Govt Mem. at 43). They conclude, "[t]he defendants' contention that they plan to carry on their normal occupational activities during the lunch hour and after-hours of this major trial in which they face serious charges is highly dubious, and is insufficient in light of the delay and other factors in this case to warrant a change of venue." (Govt Mem. at 44).

With respect to the personal financial burden that at least two of the defendants would have to endure by having the case tried in New York, the Government contends that the financial impact on the defendants of trial in New York can be alleviated considerably. At an oral argument held on December 13, 1996, the Court determined that both defendants Tracy Ford and Marlin Richardson qualified for appointment of CJA counsel.[2] The Court asked the Government whether it would agree to pay the travel and lodging expenses of these defendants in the same manner it had offered to do in *United States v. Wheaton*, 463 F.Supp. 1073, 1078 (S.D.N.Y.), *aff'd sub nom., United States v. Williams*, 614 F.2d 1293 (2d Cir.1979). During a conference held with the Court on December 19, 1996, the Government agreed to pay for the travel and lodging costs of defendants Tracy Ford and Marlin Richardson and their attorneys during the trial. The Government also agreed to pay for three trips home for defendants Ford and Richardson and their counsel during the course of the trial so that the effect of the defendants' separation from their families and businesses would be alleviated to some extent. At the same conference, the Government noted that the Criminal Justice Act would cover any expenditures necessary to bring relevant defense witnesses for these defendants to New York for trial.

The defendants also move to dismiss the majority of the counts in the Indictment on the grounds that the statute upon which the prosecution is based, 18 U.S.C. § 2512, is unconstitutionally vague as applied to them. In short, the defendants argue that the terms "primarily" and "surreptitious" in the statute render its meaning unconstitutionally vague, especially when read in connection with § 2511 of the statute, which purports to legalize some forms of "surreptitious" interceptions, *i.e.*, interceptions of conversations in which at least one party to the conversation consents, while other forms of "surreptitious" interceptions remain illegal, *i.e.*, interceptions of conversations in which no party to the conversation consents to its interception.

---

2. The Court found that Mr. Richardson's salary and readily available assets are currently insufficient to pay for legal representation. Nevertheless, in order not to delay the trial further and in the interest of fairness to Mr. Richardson whose defense would be affected by the substitution of counsel, the Court is prepared, upon approval of the Chief Judge of the District, to appoint Mr. Richardson's current attorney, Mr. Ederer, as CJA counsel during the trial, conditioned on the placement of a lien on Mr. Richardson's home. Once Mr. Richardson's home is sold, he is to reimburse the Government for its CJA expenditures. Mr. Richardson must also agree not to encumber his property without further permission of the Court.

The Government responds that the terms "primarily" and "surreptitious" are sufficiently clear to provide notice to the defendants that their conduct was unlawful, particularly when considered in conjunction with the legislative history of the act which provides specific examples of prohibited items. With respect to the defendants' argument that Section 2511 causes confusion in the interpretation of "surreptitious" under Section 2512, the Government maintains that there is no conflict between the two provisions because Section 2512 deals with the prohibition of certain devices while Section 2511 speaks to the permissibility of certain conduct. In sum, the Government insists that any reasonable person would know that Spy Factory's conduct was "at risk" under the act. (Govt. Mem. at 8).

In their pretrial motions, defendants made several discovery requests and moved for the suppression of evidence seized in the search of Spy Factory stores. For the reasons set forth on the record at the December 13, 1996 conference, the Court denies the discovery requests in part and grants others, in part, and denies the suppression motion. (12/13/96 Tr. at 39–59).

As of May 6, 1996, the Court had set a trial date of January 14, 1997. After oral argument on the instant motions, however, defendant Tracy Ford decided, after a *Curcio* hearing, that a potential conflict of interest[3] with his counsel necessitated substitution of counsel. After conferring with new CJA counsel as to the time necessary to prepare the case, the Court adjourned the trial date until February 18, 1997.

### DISCUSSION

### I. CHANGE OF VENUE

#### A. THE STANDARD UNDER FED. R.CRIM.P. 21(b)

Federal Rule of Criminal Procedure 21(b) provides that "[f]or the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to that defendant or any one or more of the counts thereof to another district." Rule 22 of the Federal Rules of Criminal Procedure states that such a motion to transfer "may be made at or before arraignment or at such other time as the court or these rules may prescribe." Fed.R.Cr.P. 22.

#### B. THE *PLATT* FACTORS

■ The following ten factors introduced in *Platt v. Minnesota Mining & Mfg. Co.*, 376 U.S. 240, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964), are routinely considered by courts deciding motions to change venue.

1. Location of the Defendants
2. Location of the Witnesses
3. Location of the Events in Issue
4. Location of Documents and Records
5. Disruption of the Defendants' Business(es)
6. Expense to the Parties
7. Location of Counsel
8. Relative Accessibility of the Place of Trial
9. Docket Condition of Each District
10. Other Special Elements

*See United States v. Russell*, 582 F.Supp. 660, 662 n. 2 (S.D.N.Y.1984) ("While not specifically adopting these factors, the Court implicitly approved them in *Platt*, and courts have consistently used them ever since."). A Court should weigh the ten *Platt* factors against one another and against the backdrop of doing what is in the overarching interest of justice. A Court should not give any one factor preeminent weight nor should it assume that the quantity of factors favoring one party outweighs the quality of factors in opposition. *See United States v. Maldo-*

---

3. The Government brought the potential conflict of interest issue to the Court's attention after it learned from the defendants' motion papers that the attorneys' fees for defendants Ford and Richardson had initially been paid from Spy Factory funds. None of the defense counsel, including Ford's attorney, at any time raised the potential of this conflict with the Court—even though attorneys for both Ford and Richardson stated at the December 13, 1996 *Curcio* hearing that they were aware of the conflict and had previously discussed it with their clients. (12/13/96 Tr. at 16–17).

456

*nado–Rivera,* 922 F.2d 934, 966 (2d Cir.1990) ("No one of these considerations [the *Platt* factors] is dispositive, and 'it remains for the court to try to strike a balance and determine which factors are of greatest importance.'") (citing *United States v. Stephenson,* 895 F.2d 867, 875 (2d Cir.1990)), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991). Rather, a Court should look to all of the factors and determine whether the interests of justice would be better served by changing the trial venue. In essence, "[t]he determination of whether a particular case calls for transfer depends upon the peculiar facts and circumstances of that case." *United States v. Posner,* 549 F.Supp. 475, 477 (S.D.N.Y.1982).

### 1. Location of the Defendants

The first of the *Platt* factors, the location of the defendants, weighs in favor of a change of venue in this action. All three of the individual defendants reside in San Antonio, and Spy Factory was incorporated in Texas and is headquartered in San Antonio. Furthermore, it has been said that as a matter of "policy" courts should, "whenever possible," try defendants "where they reside." *United States v. Russell,* 582 F.Supp. 660, 662 (S.D.N.Y.1984); *see also United States v. Cashin,* 281 F.2d 669, 675 (2d Cir. 1960) ("Recognizing the unfairness and hardship to which trial in an environment alien to the accused exposes him, and the important policies underlying the venue provisions of the Constitution and Bill of Rights, the Supreme Court has declared that venue statutes should, whenever possible, be construed so to permit trial at the residence of the defendant.") (citations and internal quotation marks omitted); *United States v. Aronoff,* 463 F.Supp. 454, 457 (S.D.N.Y.1978) ("As ... many other judges have recognized, it can be a hardship for a defendant to face a trial far away from home and from 'appropriate facilities for defense.' ... It has been stated, therefore, that as a matter of policy, a defendant should ordinarily be tried, whenever possible, where he resides.") (citations omitted). Thus, while the Supreme Court has said that the defendant's residence has no "independent significance," and should not be given dispositive weight, *see Platt v. Minne-*

*sota Mining & Mfg. Co.,* 376 U.S. 240, 245, 84 S.Ct. 769, 772, 11 L.Ed.2d 674 (1964), the fact that all defendants reside in San Antonio weighs in favor of the transfer of venue, absent other countervailing considerations.

### 2. Location of Witnesses
#### a). Defendants' Witnesses

Defendant Ron Kimball claims that the 20 witnesses he intends to call, most of them fact witnesses, all reside in San Antonio. Defendant Marlin Richardson maintains that the 9 fact witnesses he intends to call all reside in San Antonio and that "the majority of the remainder" of his 30 witnesses reside in the proximity of San Antonio. Finally, Defendant Tracy Ford insists that he plans to call 25 witnesses, all of whom reside in San Antonio. Defendants collectively claim that "[t]hese witnesses are willing and able to appear to testify in the Western District of Texas, but, for a variety of reasons, including a lack of financial resources, are unable to travel to the Southern District of New York to appear as witnesses if the trial is commenced there." (Defs.' Venue Mem. at 2).

■ The expenses for any pertinent witnesses testifying on behalf of defendants Richardson and Ford will be paid from CJA funds. Defendant Kimball has not shown himself financially incapable of paying the expenses of his witnesses. More importantly, however, as the Government points out in its response, "[t]he defendants do not identify any of these witnesses or explain their relevance to the pending charges." (Govt Mem. at 41). Courts in other circuits have held that "[g]enerally, a naked allegation that witnesses will be inconvenienced by trial in a distant forum will not suffice for transfer.... Defendants must offer specific examples of witnesses' testimony and their inability to testify because of the location of the trial.... the court must rely on 'concrete demonstrations' of the proposed testimony." *United States v. Haley,* 504 F.Supp. 1124, 1126 (E.D.Pa.1981) (citing *United States v. Kelly,* 467 F.2d 262, 265 (7th Cir.1972), *cert. denied,* 411 U.S. 933, 93 S.Ct. 1905, 36 L.Ed.2d 393 (1973); *Jones v. Gasch,* 404 F.2d 1231, 1243 (D.C.Cir.1967), *cert. denied,* 390 U.S. 1029, 88 S.Ct. 1414, 20 L.Ed.2d 286 (1968); *United*

*States v. Barrientos,* 485 F.Supp. 789, 790 n. 2 (E.D.Pa.1980)). Thus, the defendants here have not met their burden of proving that the location of necessary and relevant witnesses compels a transfer to the Western District of Texas.

### b). *Government's Witnesses*

The Government's witnesses are various Customs Service agents, FCC investigators and "seizing and custodial agents from each of the Spy Factory locations located in Atlanta, Chicago, Costa Mesa, Dallas, Denver, Houston, Las Vegas, San Antonio, St. Louis, Salt Lake City, San Diego, San Francisco, Seattle, Tucson, and West Hollywood." (Govt. Mem. at 40) "In addition, the Government may call as witnesses purchasers of the illegal devices in the Southern District of New York and elsewhere." (*Id.* at 41). Because with the exception of the purchasers in the Southern District, most of the Government's witnesses appear to be scattered around the country, and, given the defendants' failure to meet their burden, the location of witnesses does not weigh in favor of either party.

### 3. *Location of the Events in Issue*

Defendants contend that "[t]he majority of the acts and conduct in furtherance of the alleged conspiracy occurred at corporate headquarters in San Antonio, Texas." (Defs.' Venue Motion at 2). They explain:

> All correspondence and purchasing from Japan occurred from the San Antonio office. Catalog sales took place in San Antonio. Revenue from all sales throughout the country were transferred to San Antonio. Payroll and payment of all other business expenses were paid or authorized from San Antonio. All business decisions were made in San Antonio.

(*Id.* at 3). Defendants also underscore that Spy Factory has no stores in New York and only minimal business contacts here. Of " 'thousands' of illegal transactions [alleged to have been committed] by Spy Factory," the defendants argue that "only a few isolated telephone sales to four customers in New York are alleged in the Indictment and presumably are relied on by the Government to support venue in New York." (*Id.*) They further insist that "Spy Factory did no advertising in New York, ... did no direct mailing [to] New York, ... did no soliciting in New York, ... had no plans to sell in New York, ... [and] had no sales personnel in New York...." (Defs.' Venue Reply at 6 (quoting Richardson Aff.)).

In response, the Government explains (1) that "[u]ndercover agents of the Customs Service conducted surveillance" at Spy Factory's locations throughout the country, (2) that "the Customs Service" operated an undercover company in New York City from which telephone calls were made and illegal devices were received, and (3) that "of the 70 counts of the Superseding Indictment, 45 counts are substantive counts that are based on numerous sales of illegal devices to purchasers here in the Southern District of New York." (Govt Mem. at 40). Because the criminal activity that was alleged to have occurred in this case was concededly national in scope, the location of the events at issue favors neither side. *Cf. United States v. Alter,* 81 F.R.D. 524, 526 (S.D.N.Y.1979) (finding that location of events at issue favored transfer to alternate forum where "[i]t is beyond dispute that most, if not all, of the acts and conduct in furtherance of the alleged scheme to defraud occurred in [the alternate venue] and that it was the 'nerve center' of the alleged illicit operations in carrying out the scheme...."); *United States v. Bein,* 539 F.Supp. 72, 74 (N.D.Ill. 1982) (despite fact that "the entire [criminal] operation was centered in [the alternate forum]," the countervailing consideration that "victims were solicited [in the trial venue]" and that "victims wired funds from [the trial venue]," made the location of the events at issue factor weigh in favor of a transfer only by "a small margin."); *United States v. Haley,* 504 F.Supp. 1124, 1128 (E.D.Pa.1981) (where "many of the overt acts described in the indictment purportedly occurred in [the transfer venue] or surrounding states," this was showing of a "nerve center" which weighed in favor of transferring venue to the alternate forum).

### 4. *Location of Documents and Records*

Although the documentary evidence in this case is undoubtedly voluminous—"including

more than 100 boxes of documents, consensual tape recording and other physical evidence" (Govt Mem. at 41)—and although the documentary evidence is currently stored in New York, this consolidation of the records in New York was voluntarily accomplished by the Government. (Defs.' Reply at 7). The Court notes, however, that defendants did not object to the consolidation of these documents in New York. Nonetheless, given the reality of modern transportation and shipping capabilities, as well as the Government's own role in causing the documents to be stored here in New York, it would seem that this factor as well lies in favor of neither party. In a similar case, a district court found that where the government had seized documents from one location and transferred them to, and consolidated them at, the place of trial, the fact that the documents were to be found there could not properly lie in favor of the Government's opposition to the change of venue. The court explained:

> Most of the ... documents and records are now in Chicago, but this is a result of the government having seized them in New York and bringing them here. Two things are clear:
>
> (a) It would be grossly unfair to permit the government to "create" venue, or to alter the balance of relevant considerations, simply by shipping documents.
>
> (b) Documents moved here can just as easily be moved back to New York, or photocopies may be shipped there.

*United States v. Bein,* 539 F.Supp. 72, 74 (N.D.Ill.1982) (finding that "[t]his factor must therefore be viewed as essentially neutral. It thus drops out of the equation."); *see also United States v. Posner,* 549 F.Supp. 475 (S.D.N.Y.1982) (Even where the Government has "five file drawers of documents," "[t]he location of documents and records is not a major concern in these days of easy and rapid transportation.... This factor is in equilibrium insofar as transfer is concerned.").

*5. Disruption of Defendants' Business(es)*

Defendant Ron Kimball, as President of Spy Factory and as the person in charge of its operations, contends that "[i]t will be extremely difficult if not impossible for him to run his business while in a two month trial in New York." (Defs.' Venue Mem. at 3–4). He claims that "[t]he recent resignation of Defendant Marlin Richardson who was extensively involved in the day-to-day operations of the business, has created a greater need for Defendant Kimball to participate in the running of the business." (*Id.* at 4). Kimball insists that if the trial were in San Antonio he could "periodically meet with his employees after hours and ... maintain contact with his business." (*Id.*)

Defendant Marlin Richardson has just begun to manage a family-owned art gallery. He argues that "[i]t is critical to the survival of this new business" that he be able to stay in San Antonio and oversee the new enterprise. (*Id.*)

Finally, Defendant Tracy Ford contends that he will be terminated from his employment as a manager at a swimming pool company if he is forced to stand trial in New York City. (*Id.*).

Each defendant contends, therefore, that his presence in San Antonio during the trial is necessary for him to meet his business obligations.

The Government correctly argues, however, that "inconvenience and interference with normal occupational and personal activities occur whenever a defendant is involved in a trial facing serious charges." (Govt Mem. at 43) (citing *United States v. United States Steel Corp.,* 233 F.Supp. 154, 157 (S.D.N.Y. 1964); *Oil & Gas Ventures–First 1958 Fund, Ltd. v. Kung,* 250 F.Supp. 744, 755 (S.D.N.Y. 1966)). It insists that "the defendant's contention that they plan to carry on their normal occupational activities during the lunch hour and after-hours is highly dubious, and is insufficient in light of the delay and other factors in this case to warrant a change of venue." (Govt Mem. at 44). I agree with the Government's position on this issue, particularly where no defendant has shown why telephone and fax machine communication is insufficient to maintain the minimal contact that would be available to any of them over a lunch hour or after-hours if the trial were moved to San Antonio.

Nevertheless, I recognize that as one court has stated, "[t]o a failing business that depends so much on personal involvement, even a few hours each weekday plus weekends could make a substantial difference." *United States v. Aronoff,* 463 F.Supp. 454, 458 (S.D.N.Y.1978) (citing *United States v. Olen,* 183 F.Supp. 212, 219 (S.D.N.Y.) (transfer allowed defendants to use evenings and weekends to maintain their accounting practice), *mandamus denied sub nom., United States v. Cashin,* 281 F.2d 669 (2d Cir.1960)); *see also United States v. Russell,* 582 F.Supp. 660, 663 (S.D.N.Y.1984) ("Although a substantial amount of the [defendants'] time will be occupied by the trial wherever it is held, it will still be possible for them to carry on their business at least to a limited extent if they are tried in [the alternate venue]. Such a potential reduction in business interruption is an additional factor in favor of transfer."); *United States v. Haley,* 504 F.Supp. 1124, 1128 (E.D.Pa.1981) ("Courts recognize that 'personal involvement, even a few hours each weekday plus weekends could make a substantial difference' to the success of a struggling business. Defending criminal charges should not include the penalty of financial ruin where the trial might be conducted properly and legally in a forum near defendants' homes and businesses.") (citations omitted).

In summary, this factor weighs slightly in favor of the defendants, but not dispositively because modern methods of communication minimize the impact of the defendants' absence from San Antonio.

### 6. Expense to the Parties
#### a). Expense to Defendants

Because of the recent imposition of Judge Pollack's Ex Parte Order and its effect on defendants' ability to use Spy Factory assets to support themselves, their families, and their legal defense, defendants argue that "[t]he cost to transport and provide accommodations for themselves, their lawyers and their witnesses in New York City, one of the most expensive cities in the world, for perhaps two months is beyond the capabilities of these defendants." (Defs. Venue Mem. at 4).

However, defendants Kimball and Spy Factory, Inc. have not demonstrated that they are financially incapable of funding their defense.[4] Moreover, in light of the Government's recent offer to fund the travel and lodging expenses of defendants Tracy Ford and Marlin Richardson and their counsel, and in light of the fact that CJA funds will cover the expenditures necessary to bring relevant defense witnesses to New York, the factor of expenses no longer weighs in favor of the defendants.

#### b). Expense to the Government

The Government contends that it "would be put to great expense to relocate its entire prosecution team to San Antonio, as well as bringing at least one Assistant United States Attorney in San Antonio up to speed on the case." (Govt Mem. at 42). The Government also insists that it would not be inexpensive to relocate back to Texas all of the documentary evidence in this case. For these reasons, the Government contends that "the expenses to the parties weighs in favor of neither side." (*Id.*)

Because the defendants' argument regarding their expense in trying the case in New York has been virtually eviscerated by the Government's offer to fund the travel and lodging costs of defendants Tracy Ford and Marlin Richardson and their counsel if the case is tried in New York, and because the Government would have to undergo significant expenditures if the case were moved from New York, the expense to the parties factor weighs in favor of keeping the trial in the Southern District.

### 7. Location of Counsel

At the time of the filing of defendants' venue motion, all three lawyers representing

4. Although defendants make the bald assertion that "[n]one of the defendants has sufficient resources to finance a two month trial in New York," (Defs.' Venue Mem. At 13), there has been no evidence adduced from which the Court could conclude that Defendant Ronald Kimball has in-sufficient funds to provide for his defense or his sustenance at a trial in New York. To the contrary, Kimball's attorney conceded at oral argument that his client was much better off financially than his co-defendants. (12/13/96 Tr. at 86).

the individual defendants were from San Antonio. However, in the interim, Tracy Ford's San Antonio lawyer has been replaced by a CJA attorney from New York because of a potential conflict of interest with Ford's prior counsel. Ronald Kimball's San Antonio lawyer has advised the Court that if the trial is not transferred to San Antonio, local counsel in New York will assume the role of lead counsel in the case. In a letter to the Court dated December 20, 1996, Mr. Kimball's attorney underscored that in the event the transfer is denied, this substitution of counsel would not occasion delay nor prejudice Mr. Kimball. (Letter from Goldstein to Court of 12/20/96 at 1–2 (assuring the Court that local counsel for Mr. Kimball "is a very able, New York practicing attorney, who has served as local counsel in this cause from the outset, performed many of the local discovery and jury selection duties on behalf of all Defendants in this cause and is sufficiently familiar with the facts and issues in this case that his substitution as lead counsel would occasion no delay in this cause.")). The Spy Factory corporation's attorney has at all times been a New York lawyer, and, obviously, the two assistant United States attorneys are both from this district. Therefore, given that there is only one counsel who currently resides in San Antonio, the location of counsel factor no longer weighs in favor of a transfer of venue.

### 8. Relative Accessibility of Place of Trial

Although the Government asserts that "[t]he relative accessibility of the place of trial weighs heavily in favor of denying the motion to transfer this case" (Govt Mem. at 42) because "New York has superior access to three airports, numerous train lines and an abundance of hotel accommodations," (Govt Mem. at 43), the Government has not pointed to any problems of accessibility in the alternate forum. Accordingly, this factor does not weigh toward either conclusion. See, e.g., United States v. United States Steel Corp., 233 F.Supp. 154, 158 (S.D.N.Y. 1964) ("The efficiency of modern air transportation renders rather sterile any argument" that one forum is more accessible than the other.).

### 9. Docket Condition of Each District

Exhibit 10 to Defendants' Reply Memorandum is a letter from Chief Judge Harry Lee Hudspeth of the Western District of Texas which provides Judge Hudspeth's personal "assur[ance]" that a judge in that district "would be available to try this case if it were transferred to [their] district." (Defs.' Reply Ex. 10). This Court, however, is prepared to try this case immediately. Moreover, a transfer to San Antonio will inevitably necessitate a delay in the impending trial date, if for no other reason than that the local assistant United States attorneys as well as the local judge would have to prepare themselves for the trial of this case. In light of this almost certain delay, I find that this factor does not weigh in favor of either party.

The Court notes that the existence of a potential conflict of interest and the resulting appointment of new counsel for defendant Tracy Ford has necessitated a postponement of the original January 14, 1997 trial date to February 18, 1997. The interest of justice is not served, however, by requiring an assistant United States attorney and a judge in the Western District of Texas to immerse themselves in the case in the manner in which Ford's new lawyer has agreed to do in order to meet the imminent trial date. In fact, given that this Court had to canvass a wide array of CJA counsel in order to locate one attorney whose schedule would allow him to devote himself exclusively to this matter— and without significant interruption over the holidays and weekends—the Court finds it unlikely that any assistant United States attorney or judge in the Western District of Texas would be in a position to devote such exclusive attention to this matter.

Furthermore, although a delay of the trial has already been occasioned by the substitution of Ford's attorney, the Court does not consider this factor to weigh in favor of a change of venue given that it was the failure of all the defendants to inform the Court earlier of the potential conflict that has caused this delay. If defense counsel had raised the potential conflict of interest at the beginning of the case, when they were initially retained with Spy Factory funds—instead

of waiting for the Government to advise the Court of the conflict after the motion papers were filed—this adjournment would not have been necessary and the original trial date of January 14, 1997 would have been kept.

### 10. Other Special Elements

#### a). Delay [5]

It is true that in change of venue cases, as the Government explains, "[o]ne of the factors to which the Second Circuit has paid special attention is a defendant's delay in moving to transfer the case." (Govt Mem. at 35 (citing *United States v. Keuylian*, 602 F.2d 1033, 1038 (2d Cir.1979); *United States v. Maldonado–Rivera*, 922 F.2d at 966)). In the instant case, there is no question that the defendants were woefully late not only in filing their motion to change venue, but also in apprising the Court of their intention to file such a motion. By the lead defense counsel's own admission, such neglect was inexcusable. (*See, e.g.*, 12/13/96 Tr. at 72 ("MR. GOLDSTEIN: Your Honor, you are correct. I was the major spokesman at each of those hearings with respect to the defense, and I take full responsibility, and the Court is right, and I tried to say that each time, one, that we did not say anything to the Court about it and did not apprise the Court either in writing or at the numerous hearings we had, and we did have full opportunity to do so.")).

As the Government argues, "at each of the conferences before this Court, the defendants gave every indication that they intended to proceed with the trial in the Southern District of New York." (Govt Mem. at 36). The original indictment in this case was returned in August of 1995. The Court held an initial status conference on September 28, 1995. At that conference, both sides spoke of the enormous amount of discovery that was to take place; however, the defendants did not mention the possibility that they might file a motion to change venue, even though "the Government offered and the Court directed the Government to get all of the discovery centralized in New York" (Govt Mem. at 37)—a laborious and expensive process that might have been avoided if the Court had been informed earlier of the defendants' intent to file a motion to change venue. In addition, at that same conference, the defendants "involved this Court in the discovery process by having this Court review all of the allegedly attorney-client privileged documents." (Govt Mem. at 37 (citing transcripts)). Finally, before the parties left the conference, the Court instructed defense counsel to "tell me or [ ] be prepared to discuss with me the nature of the motion [sic] that you are thinking of making" at the next conference. (Govt Sur–Reply on Venue at 5 (quoting 9/28/85 Tr. at 16)).

The parties returned to the Court on January 17, 1996, for another conference where

---

**5.** In the Government's Sur–Reply regarding defendants' delay in bringing the venue motion, the Government stated that "had venue been transferred at an earlier date, the Government would have sought to add numerous additional counts to the superseding indictment, including the possibility of mail fraud and export violations, as well as additional money laundering, smuggling and Section 2512 counts for which venue lies in the Western District of Texas and not the Southern District of New York." (Govt Sur–Reply on Venue at 8). Understandably, these comments sent forth a wave of concern among defense counsel regarding the possibility of a virtually identical prosecution in the two districts. At oral argument, defense counsel cogently argued that if such charges were truly being contemplated by the Government, then the efficient administration of justice would recommend that the trial be transferred to Texas where all the potential charges could be consolidated. (*See* 12/13/96 Tr. at 67–71). In response to the concerns of the defendants and the Court (as expressed at oral

argument), the United States Attorney for the Western District of Texas wrote to the Court, with copies to defense counsel, and explained that due to the Department of Justice's petite policy prohibiting successive prosecutions in separate districts, "[i]t is ... unlikely that [the Western District of Texas] would pursue prosecution of the same defendants based upon substantially the same acts or transactions which form the basis of the Southern District of New York indictment." (Letter from James William Blass to the Court of 12/19/96 at 1–2). Given this assurance, and despite the unwillingness of defense counsel to accept it, (*see* Letter from Gerald H. Goldstein to the Court of 12/27/96), I find, as the Government argues, that "the defendants in this case have received ample assurance that no second prosecution is anticipated or likely. Indeed, the defendants have received far more clear assurances on that score than do most defendants who commit multiple crimes in more than one jurisdiction." (Letter from Daniel J. Fetterman to the Court of 1/2/97 at 1–2).

discovery and privilege issues were discussed, but, again, the defendants did not mention a potential change of venue motion, even though the Court did inquire of the timing of motions in general. (*See* Govt Sur-Reply on Venue at 5). Two months later, on March 15, 1996, the parties again appeared before the Court to resolve privilege issues and to discuss possible motions, but defense counsel again did not mention the venue motion. Then at the May 6, 1996 conference, a motion[6] and trial schedule was set. Despite the fact that a January 1997 trial date was set, and that several possible pretrial motions were named, the defendants still failed to mention the fact that a change of venue might be among the defense motions. Mr. Goldstein, lead counsel for the defense, only mentioned the following:

> There are at least two motions that I would like to ask for leave—I will do that in writing and submit [sic] the Court with reasons. But obviously the question of the [constitutionality of] the statute, it is a question, at least with respect to this statute, that is going to be one of first impression.... The other one deals with motions to suppress, particularly if we consolidate them into one mowing [sic].

(Govt Sur-Reply on Venue at 6 (quoting 5/6/96 Tr. at 5)).

Even though Spy Factory had stopped paying their legal fees months earlier and defendant Ford had left Spy Factory's employment and defendant Richardson was imminently to leave to start a family business, at the August 26, 1996 conference, held more than two months after the defendants had been arraigned on the Superseding Indictment—and well after the financial impact of the *ex parte* order was patently clear—"the defendants raised several issues with this Court, all of which indicated that they planned to go to trial in the Southern District of New York." (Govt Mem. at 38). "For instance, attorneys for Ronald Kimball, on behalf of all defendants, agreed to meet with the Government and the Southern District of New York's jury clerk to discuss a process for jury selection.... Counsel also inquired about this Court's requirements for the presence of local counsel during a trial in the Southern District of New York." (*Id.*). Despite the fact that the Court emphasized to defense counsel that the January trial date would not be moved "[b]arring an act of God," (Govt Mem. at 38 (citing 8/26/96 Tr. at 27)) defense counsel still failed to raise the issue of the venue motion, even though they had to have known that such a motion would have a significant impact on the timing of the trial.

In the face of this inexcusable delay, it is of little significance that defendants point out that both of the cases relied upon by the Government involved situations in which the defendant(s) filed their motions "virtually on the eve of trial" and, more importantly, *after* the filing of pre trial motions. (Defs.' Venue Reply at 6–7). In fact, defendants' contention is misleading upon a close reading of the cases relied upon by the Government. While it is true that in both *United States v. Maldonado–Rivera*, 922 F.2d 934, 966 (2d Cir. 1990), *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991) and *United States v. Keuylian*, 602 F.2d 1033, 1038 (2d Cir.1979), the change of venue motions were submitted after the filing of pretrial motions, in neither case was the delay between the indictment and the filing of the venue motion as great as it is in the instant case.

---

**6.** When the motion schedule was originally set at the May 6, 1996 conference, the Court instructed defendants to serve all pretrial motions on the Government by August 9, 1996. The defendants later claimed, however, that there was an infusion of confusion and complexity injected into the case by the June Superseding Indictment and the June 14, 1996 *ex parte* order signed by Judge Pollack. Defendants asked, and the Court granted the defendants' written request to extend their time to serve their papers until September 9, 1996. However, it must be underscored that when defendants made their request, they failed to inform the Court that a venue motion was contemplated. Had they done so, the Court would have been much less likely to grant an extension in light of the patently time-sensitive nature of such a motion. At the August 26, 1996 conference, again without the knowledge that a venue motion would be submitted, the Court granted a final one week postponement, allowing defendants' papers to be served September 16, 1996. This extension also would not have been granted if the Court had been apprised of the potential for a change of venue motion.

For example, in *United States v. Maldonado–Rivera*, 922 F.2d 934, 966 (2d Cir.1990), *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991), the defendants filed their motion "some nine months after commencement of the prosecution, after discovery was nearly complete, after substantive motions had been filed, and on the eve of the court's setting a date for trial." Here, of course, defendants filed their motion over one year after the "commencement of the prosecution;" after the "discovery was nearly complete," and not just "on the eve of the court's setting a date for trial," but actually on the eve of the trial itself. Similarly, in *United States v. Keuylian*, 602 F.2d 1033, 1038 (2d Cir.1979), the Second Circuit upheld a denial of change of venue where the motion was filed only four months after the indictment. Therefore, even though the defendants in the instant case filed their venue motion together with the rest of the pretrial motions, and even though the complexity of the case and the extent of discovery might explain to some extent why the defendants waited so long to file their venue motion, there is no explanation nor excuse for why defense counsel failed earlier to bring to the Court's attention the possibility that such a motion was being contemplated.

In short, defense counsel should have brought to the Court's attention the fact that they would seek a change of venue so the Court could require defendants to file such a motion much earlier in the court proceedings, before the Court ruled on numerous discovery questions, privilege issues, and other pretrial matters that have consumed over one year of this Court's calendar. (12/13/96 Tr. at 61, 63, 72–74). Because of defendants' delay, a transfer of the action to the Western District of Texas at this late stage would necessitate not only that the new judge be bound by important decisions already made by this Court, but also that the Western District of Texas judge duplicate the efforts made by this Court to become familiar with the case. Such a prospect does not comport with the efficient or fair administration of justice and this Court will not condone the delay occasioned by the defendants' conduct. Therefore, the defendants' delay not only in filing the motion to change venue, but also their delay in informing the Court of their intent to file the motion, weighs qualitatively and heavily in favor of retaining the trial in the Southern District.[7]

■ In sum, then, having considered with great care each of the above factors, the Court concludes that the defendants have not shown that the interests of justice require a transfer of this case. I find that most of the factors, such as the location of witnesses, events, counsel, documents and records, as well as the relative accessibility of the respective venues, weigh in favor of neither party. The factors weighing most strongly in the favor of the Government are the docket conditions of each district—to the extent that a transfer would inevitably necessitate some delay in the trial date—and the defendants' delay in bringing the motion to change venue. Also, because all counsel except one now resides in New York, this factor now weighs more in the Government's favor than in the defendants'.

On the other hand, the factors weighing in favor of transferring venue are the location of the defendants, the potential for disruption of the defendants' businesses and employment, and the defendants' expenses in trying the case in New York. Because the strongest of these factors—namely the tremendous expense the defendants would be forced to undertake in trying the case in New York— has been largely eviscerated by appointment of CJA counsel and the Government's offer to pay for other expenses, I find that a change of venue is unnecessary and not in the interests of justice. Although there is still a potential for disruption of the defendants' businesses and personal life, I find that this factor, standing alone, does not outweigh the countervailing considerations for keeping the case here: defendants' delay in bringing this matter to my attention and the further delay such a transfer would occa-

7. The Court agrees with the general proposition of defense counsel Goldstein that the acts of counsel should not be held against the defendants. (12/13/96 Tr. at 85). A defense attorney, however, is a defendant's representative to the Court. Nevertheless, the Court has also taken action to alleviate a great deal of the burden on the defendants of the trial in New York.

sion. *See e.g., United States v. United States Steel Corp.,* 233 F.Supp. 154, 156 (S.D.N.Y. 1964) (providing that "mere inconvenience, interference with one's routine occupational and personal activities, and other incidental burdens which normally follow when one is called upon to resist a serious charge do not ipso facto make the necessary showing that a transfer is required in the interest of justice. As a general rule a criminal prosecution should remain in the original district."); *cf. United States v. Stephenson,* 895 F.2d 867, 875 (2d Cir.1990) (reviewing district court's decision for abuse of discretion and holding that "[a]lthough [the defendant] points to several considerations favoring the [alternate forum] as a more convenient forum, the residences of a number of Government witnesses and the location of the prosecutor and the documents and tape recordings relevant to the case against [the defendant] favored holding the trial in the Southern District.").

 Furthermore, to the extent that there is a "policy" favoring the trial of defendants where they reside, this "policy" is in tension with the more general presumption that "a criminal prosecution should be retained in the original district." *United States v. Posner,* 549 F.Supp. 475, 477 (S.D.N.Y.1982) (citing cases). Hence, because "the burden is on the moving defendant to justify a transfer under Rule 21(b)," *United States v. Aronoff,* 463 F.Supp. 454, 460 (S.D.N.Y.1978), and defendants here have not persuasively proven why the interests of justice require a transfer, I decline to change venue in this case. Instead I will follow the practice of Judge Lasker in *United States v. Wheaton,* 463 F.Supp. 1073, 1078 (S.D.N.Y.), *aff'd sub nom., United States v. Williams,* 614 F.2d 1293 (2d Cir.1979), and condition the denial of the transfer motion on the Government's "representation to make available to the defendant, upon a good faith showing of need, reasonable funds for transportation to New York City and for subsistence for the defendant and witnesses residing in the [alternate venue] whom he may reasonably call in his defense." *See also United States v. Haley,* 504 F.Supp. 1124, 1129 (E.D.Pa.1981) (providing that "[t]o lessen this impact and the concomitant prejudice which inures to indigent defendants, the Government may offer to pay travel and subsistence expenses for defendants and their witnesses. Indeed the Government has done so in other instances where it opposed a motion to transfer.") (citing *Wheaton*).

## II. DEFENDANTS' MOTION TO DISMISS FOR VAGUENESS

### A. STANDARD FOR VAGUENESS

It has been called the "first essential of due process of law," *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926), that statutes, particularly statutes whose violation carries criminal consequences, provide notice to citizens that their conduct is potentially unlawful. The rationale for this long-tested principle of due process has been articulated by the Supreme Court and is frequently reiterated:

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Grayned v. Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972).

Under due process, a statute may be challenged for vagueness on its face or vagueness as applied to the defendants' specific conduct.

### 1. Vague On Its Face

 In *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S.

489, 494–95, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982), the Supreme Court stated that "[i]n a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." The Supreme Court explained that if a statute does not reach constitutionally protected conduct, "then the overbreadth challenge must fail," and the court must apply the statute to the particular conduct charged to determine whether it is impermissibly vague. *Id.; see also Levas & Levas v. Village of Antioch,* 684 F.2d 446, 451 (7th Cir.1982) ("a finding of unconstitutional vagueness cannot be based on uncertainty at the margins, or on a parade of bizarre hypothetical cases: problems of that order can be resolved in challenges to the ordinance as applied."). A statute that does not involve constitutionally protected conduct can only be struck down for facial vagueness if it is vague in all of its applications. As the Second Circuit has stated, "[a] defendant claiming a statute is fatally vague on its face must show that the statute is vague 'in the sense that no standard of conduct is specified at all.... The defendant bears the burden of showing the statute to be 'impermissibly vague in all of its applications.'" *United States v. Nadi,* 996 F.2d 548, 550 (2d Cir.) (citations omitted), *cert. denied,* 510 U.S. 933, 114 S.Ct. 347, 126 L.Ed.2d 311 (1993).

 The statute at issue here does not implicate any constitutionally protected conduct. During oral argument, defendants, af-

ter having neglected to raise the issue in their written submissions to the Court, briefly raised the possibility that the statute might implicate First Amendment concerns because "2512 in many respects goes to speech. It talks about people talking. It talks about expressions of speech, interceptions of speech." (12/13/96 Tr. at 89). I find this argument unpersuasive. Although there may be a constitutional right to hear [8] there has never been articulated nor implied any constitutional right to hear the private speech of others or to be provided with a specific means to record one's own speech.[9] Therefore, because "vagueness challenges that do not involve the First Amendment must be examined in light of the specific facts of the case at hand and not with regard to the statute's facial validity," *Nadi,* 996 F.2d at 550, I undertake a vagueness-as-applied analysis in this case.

### 2. *Vague As Applied*

 The heart of the case, therefore, is the question whether Section 2512 is vague as applied to the particular facts in question. *See United States v. Santos,* 64 F.3d 41, 47 (2d Cir.1995) ("Vagueness challenges that do not involve the First Amendment must be examined in light of the specific facts of the case at hand and not with regard to the statute's facial validity."), *vacated on other grounds,* —— U.S. ——, 116 S.Ct. 1038, 134 L.Ed.2d 186 (1996). The Court must examine the facial vagueness challenge and, "as-

---

8. *See, e.g., Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 389, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969) (stating in broadcast licensing case that "[i]t is the right of the viewers and listeners, not the right of the broadcasters, which is paramount."); *Kleindienst v. Mandel,* 408 U.S. 753, 762–63, 92 S.Ct. 2576, 2581–82, 33 L.Ed.2d 683 (1972) (recognizing in First Amendment jurisprudence the right to "receive information and ideas."). *See generally,* Ian M. Rose, Note, Barring Foreigners From Our Airwaves: An Anachronistic Pothole on the Global Information Highway, 95 Colum.L.Rev. 1188, 1205 (1995) (providing discussion of the Supreme Court's "right to hear" cases and explaining that "[a]lthough the First Amendment is often thought of as granting an affirmative right to speak, the Court has in a number of circumstances recognized a concomitant right to hear and to receive information.").

9. Defendants also raised the possibility at oral argument that the statute's prohibition of advertising of such devices might implicate the First Amendment. (12/13/96 Tr. at 90) However, the defendants have not been directly charged with, nor raised a challenge against, that section of the statute and therefore any ruling based on that section would be inappropriate. To the extent that portion of the statute is implicated as an object of the conspiracy charge, the Government has stated it is "not going to go forward on the object." (12/13/96 Tr. at 157). Furthermore, even if the defendants had been so charged and even if the advertising provision did implicate the First Amendment, the Supreme Court has said that such commercial speech is not entitled to the heightened vagueness review. *Cf. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 496–97, 102 S.Ct. 1186, 1192–93, 71 L.Ed.2d 362 (1982).

suming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–95, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982); *see also United States v. Nadi*, 996 F.2d 548, 550 (2d Cir.) ("The defendant bears the burden of showing the statute to be 'impermissibly vague in all of its applications.'") (citations omitted), *cert. denied*, 510 U.S. 933, 114 S.Ct. 347, 126 L.Ed.2d 311 (1993). "A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. A Court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law." *Hoffman Estates* 455 U.S. at 495, 102 S.Ct. at 1191.

█ A two-part test is used to assess whether a particular statute is unconstitutionally vague as applied:

When the challenge is vagueness 'as applied,' there is a two-part test: a court must first determine whether the statute 'give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited' and then consider whether the law provides explicit standards for those who apply [it]. . . . Because the statute is judged on an as applied basis, one whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness.

*Nadi*, 996 F.2d at 550; *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) ("As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.").

In conducting a vagueness as applied analysis, the Seventh Circuit has noted that "criminal laws are more searchingly examined for vagueness, because the consequences of imprecision are severe, than are either pure economic regulation . . . or civil legislation." *Levas & Levas v. Village of*

*Antioch*, 684 F.2d 446, 452 (7th Cir.1982). That same Court explained that "in the vagueness context, the canons of construction that would narrow a statute to avoid constitutional problems have no place. The statute must be construed to give full effect to any possible ambiguities." *Id.* at 452.

### a) *Fair Notice to Persons of Ordinary Intelligence*

█ The crux of this prong of the vagueness analysis is the requirement that the statute be sufficiently clear to provide notice to potential wrongdoers that the conduct in which they are engaged has the potential for civil or criminal liability. As the Second Circuit has explained, "[o]bjections to vagueness . . . rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *United States v. Strauss*, 999 F.2d 692, 698 (2d Cir.1993) (citing *Maynard v. Cartwright*, 486 U.S. 356, 361, 108 S.Ct. 1853, 1857–58, 100 L.Ed.2d 372 (1988)). When assessing a statute for vagueness under this prong, only the actual conduct of the defendants involved can be considered; the Court must disregard other, more innocent or questionable hypothetical conduct under the statute. It has been emphatically reiterated that "[b]ecause the statute is judged on an as applied basis, one whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness." *Nadi*, 996 F.2d at 550.

In elucidating what level of notice is required to survive a vagueness challenge, the Supreme Court has noted that statutes containing terms of degree are problematic in providing notice to potential wrongdoers. *See Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1047, 111 S.Ct. 2720, 2730, 115 L.Ed.2d 888 (1991) (providing that statute allowing criminal defense attorney to describe to the public the "general nature of the defense without elaboration" was problematic because "general" and "elaboration" "are both classic terms of degree" that do not provide sufficient guidance to the public in determining where their conduct is unlawful.) In *Gentile*, the Supreme Court further insisted that it was an unfortunate indication of a statute's vagueness when an individual had

studied the law and still could not discern how to abide by its dictates. As the Court explained, "[t]he fact that Gentile was found in violation of the Rules after studying them and making a conscious effort at compliance demonstrates that Rule 177 creates a trap for the wary as well as the unwary." *Gentile*, 501 U.S. at 1051, 111 S.Ct. at 2732 (1991).

On the other hand, it has been said that vagueness:

> standards should not, of course, be mechanically applied. The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.

*Hoffman Estates*, 455 U.S. at 498, 102 S.Ct. at 1193.

Finally, "the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Id.* at 499, 102 S.Ct. at 1193. The Second Circuit has explained that "[i]n fact, the inclusion of an intent provision will often save an otherwise vague statute." *United States v. Schneiderman*, 968 F.2d 1564 (2d Cir.1992) ("The Supreme Court has repeatedly held that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of mens rea."), *cert. denied*, 507 U.S. 921, 113 S.Ct. 1283, 122 L.Ed.2d 676 (1993); *Strauss*, 999 F.2d at 698 (same).

### b) *Sufficient Guidance for Enforcers of the Law*

■ The second prong of the vagueness analysis looks to whether the given statute is sufficiently clear for prosecutors and police officers to enforce in a non-arbitrary and non-discriminatory fashion. The underlying fear is that "[w]here the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep' [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender v. Lawson*, 461 U.S. 352, 358, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). While the courts recognize that "[c]learly, '[e]ffective law enforcement' often requires the exercise of some degree ... of [prosecutorial] judgment [and] this alone does not render a statute unconstitutional," *Nadi*, 996 F.2d at 550 (citations omitted), the courts do scrutinize the statute to discern whether its language "is so imprecise that discriminatory enforcement is a real possibility." *Gentile*, 501 U.S. at 1051, 111 S.Ct. at 2732.

### B. ASSESSING THE VAGUENESS OF SECTION 2512 AS APPLIED TO DEFENDANTS

Even though the Court must assess the vagueness of Section 2512 as it applies to the specific conduct of defendants and not according to the facial vagueness of the terms of the statute itself, the Court nevertheless must first look to the plain meaning of the terms of the statute in order to discern whether those terms impart sufficient clarity to a person of ordinary intelligence. The following is an excerpt from the relevant portion of the statute:

> **§ 2512. Manufacture, distribution, possession, and advertising of wire, oral, or electronic communication intercepting devices prohibited**
>
> (1) Except as otherwise specifically provided in this chapter, any person who intentionally— ...
>
> (b) manufactures, assembles, possesses, or sells any electronic, mechanical, or other device, *knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications,* and that such device or any component thereof has been or will be sent

through the mail or transported in interstate or foreign commerce; . . . .

18 U.S.C. § 2512(1)(b) (emphasis added).

Defendants are correct that there has been no extensive examination of whether Section 2512 is unconstitutionally vague. The few cases that have considered the proposition have concluded in conclusory terms that the statute is *not* vague, however. *See e.g., United States v. Martin,* 1 F.3d 1250, 1993 WL 298884, *1–*2 (10th Cir.1993) (unpublished disposition) (concluding in a satellite scrambler case that "the language of § 2512(1)(b) was sufficiently clear to put [the defendant] on notice that his conduct was prohibited."); *id.* at *2 (providing that "[w]here, as here, the language of the statute plainly covers the defendant's actions, the statute need not have been previously held applicable on the same facts to survive a vagueness attack."); *United States v. Novel,* 444 F.2d 114 (9th Cir.1971) (concluding in a one paragraph opinion "that the statute is not unconstitutionally vague and ambiguous"); *cf. United States v. Bast,* 495 F.2d 138, 144 (D.C.Cir.1974) (rejecting the argument that § 2512 and § 2511 are in conflict rendering either one inscrutable but providing that "[a]ny claim that fair notice is lacking is . . . appropriately reached on a more complete record, after the Government has had an opportunity to establish scienter, for the scienter requirement needed for willful conduct may rescue a statute from the infirmity of vagueness."). *But see United States v. Hochman,* 809 F.Supp. 202, 204 (E.D.N.Y. 1992) (noting that the language in the statute providing that the devices are "primarily useful for the purposes of surreptitious interception" is "troublesome."). Because the proposition has not been conclusively established by any court and certainly has not received any significant analysis, I consider the question of § 2512's vagueness, if any, to be of first impression in this Circuit.

Defendants point to two crucial concepts within the statute that render its meaning inscrutable to the person of ordinary intelligence: "primarily useful" and "surreptitious." Defendants contend that the pivotal term of the section, "surreptitious" is nowhere defined in the statute and that its

plain meaning or dictionary definition "engender intractable ambiguity." (Defs' Vagueness Mem. at 1). Defendants also argue that the modifier "primarily" renders the statute vague. Although they concede that the modifier "primarily" has been permitted in other contexts, they contend that it has only been permitted when accompanied by explanatory language, guidelines, and examples that further elucidate the use at issue.

While I recognize that each of these concepts hinge on one another and that in order to establish the full meaning of the statute, the relevant provisions must be read as a whole, and their ambiguities, if any, must be taken together, I analyze each of the defendants' criticisms of the statute in turn.

### 1. The "Primarily Useful" Language
#### a) Plain Meaning/Dictionary Definition

As defined by Webster's Third New International Dictionary—Unabridged, "primarily" is an adverb meaning "first of all: fundamentally, principally . . . in the first place: originally." Webster's Third New International Dictionary 1800 (3d. ed. 1986). It is not a word that is unfamiliar to the common speaker; rather we invoke it in common parlance and seldom stop to consider its ambiguity. However, because the term "primarily" imports gradations of degree and can only be defined by reference to its position on a continuum, upon first inspection, the phrase "primarily useful" in Section 2512 appears to be precisely the sort of "classic term of degree" that the Supreme Court rebuked in *Gentile. See Gentile,* 501 U.S. at 1048, 111 S.Ct. at 2731 (providing that statute allowing criminal defense attorney to describe to the public the "general nature of the defense without elaboration" was problematic because "general" and "elaboration" "are both classic terms of degree" that do not provide sufficient guidance to the public in determining where their conduct is unlawful.)

Yet despite the term's inherent relativity, in none of the cases in which "primarily intended or designed for use" has been considered has any court found such language unconstitutionally vague. *See, e.g., Posters 'N' Things, Ltd. v. United States,* 511 U.S.

513, 517, 114 S.Ct. 1747, 1750, 128 L.Ed.2d 539 (1994); *Hoffman Estates*, 455 U.S. at 500–01, 102 S.Ct. at 1194–95. *But see Hochman*, 809 F.Supp. at 204 (E.D.N.Y.1992) (noting that the language in the statute providing that the devices are "primarily useful for the purposes of surreptitious interception" is "troublesome."). Supreme Court precedent in the cases construing various drug paraphernalia statutes is particularly instructive. In these cases, the Supreme Court has assessed the vagueness of linguistically similar statutes which, for example, restrict retailers from selling "any equipment, product, or material of any kind which is *primarily intended or designed for use* " with illegal drugs. *Posters 'N' Things*, 511 U.S. at 517, 114 S.Ct. at 1750 (emphasis added).

In *Hoffman Estates*, 455 U.S. at 500–01, 102 S.Ct. at 1194–95, the Supreme Court construed the "designed for use" language of a local drug paraphernalia ordinance. The Court found it "plain that the standard encompasses at least an item that is principally used with illegal drugs by virtue of its objective features, i.e., features designed by the manufacturer." *Id.* at 501, 102 S.Ct. at 1195. The Court emphasized that "[a] business person of ordinary intelligence would understand that this term refers to the design of the manufacturer, not the intent of the retailer or customer. It is also sufficiently clear that items which are principally used for nondrug purposes, such as ordinary pipes, are not 'designed for use' with illegal drugs." *Id.*

Similarly, in *Posters 'N' Things*, 511 U.S. at 519, 114 S.Ct. at 1751, the Supreme Court held that the federal drug paraphernalia

statute's "primarily intended for use" language should be construed with reference to "a product's likely use rather than to the defendant's state of mind." When construed in this light, the Supreme Court found the language unproblematic. By construing "primarily" in an objective fashion—with reference to a standard of how customers in general use the product rather than how any particular customer might use it—the Supreme Court avoided the sort of troubling subjectivity inherent in the *Gentile* and *Kolender* concepts of degree implicated by the phrases "general" and "credible and reliable." *Cf. Gentile*, 501 U.S. at 1048–49, 111 S.Ct. at 2731 ("The right to explain the 'general' nature of the defense without 'elaboration' provides insufficient guidance because 'general' and 'elaboration' are both classic terms of degree."); *Kolender*, 461 U.S. 352, 103 S.Ct. 1855 (holding that loitering statute that had been construed by the courts to require individuals to provide "credible and reliable identification" to police officers was unconstitutionally vague because of the undefined nature of those subjective terms). Instead, in evaluating an object's "primary use," the Supreme Court has emphasized the objective determination of a device's most probable use. This objective standard is substituted for the more individualistic and thereby problematic determination of what the device's "primary" use to any one consumer might be.

It is true, however, as defendants remind the Court, that the statute at issue in *Posters 'N' Things* is distinguishable from the instant statute in that the *Posters 'N' Things* statute contained a nonexhaustive list of examples of *per se* drug paraphernalia[10] as well as a list

---

**10.** 21 U.S.C. § 857(d) provides the following list of items that are deemed per se drug paraphernalia:

> The term "drug paraphernalia" means any equipment, product, or material of any kind which is primarily intended or designed for use in manufacturing, compounding, converting, concealing, producing, processing, preparing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance, possession of which is unlawful under the Controlled Substances Act … It includes items primarily intended or designed for use in ingesting, inhaling, or otherwise introducing marijuana, cocaine, hashish, hash-

ish oil, PCP, or amphetamines into the human body, such as—(1) metal, wooden, acrylic, glass, stone, plastic or ceramic pipes with or without screens, permanent screens, hashish heads, or punctured metal bowls; (2) water pipes; (3) carburetion tubes and devices; (4) smoking and carburetion masks; (5) roach clips; meaning objects used to hold burning material, such as a marihuana cigarette, that has become too small or too short to be held in the hand; (6) miniature spoons with level capacities of one-tenth cubic centimeter or less; (7) chamber pipes; (8) carburetor pipes; (9) electric pipes; (10) air-driven pipes; (11) chillums; (12) bongs; (13) ice pipes or chillers;

of "objective criteria for assessing whether items constitute drug paraphernalia.". *Posters 'N' Things,* 511 U.S. at 526, 114 S.Ct. at 1754.[11] These additional elements, the Court pointed out, "minimize the possibility of arbitrary enforcement and assist in defining the sphere of prohibited conduct under the statute." *Id.* This additional level of notice to potential lawbreakers, as well as to the law enforcement community, is missing from the instant statute. It is troubling that Section 2512 does not provide a list of prohibited devices, nor does is provide "objective criteria" from which citizens and law enforcement officers could discern what devices are prohibited.

However, in the Senate Report accompanying Section 2512 there is a nonexhaustive list of items intended to be prohibited under the statute. The Report provides the following examples of devices whose design renders them primarily useful for surreptitious interceptions. It states:

> The prohibition will thus be applicable to, among others, such objectionable devices as the martini olive transmitter, the spike mike, the infinity transmitter, and the microphone disguised as a wristwatch, picture frame, cuff link, tie clip, fountain pen, stapler, or cigarette pack.

S.Rep. No. 90–1097, 90th Cong., 2d. Sess., 95 U.S.C.C.A.N. 2112, 2183 (1968). While the Court recognizes that the inclusion of examples in a Senate Report is a far cry from an inclusion of a list in the statute itself, and the Court harbors some doubt whether knowledge of a Senate Report that is not endorsed by the full Congress can be imputed to the average citizen,[12] the Court finds that the instant defendants can be charged with knowledge of the Senate Report because references to the Report itself were found within in their possession.

When documents from the Spy Factory headquarters were seized by the Government, among the documents collected was an article on Section 2512 that made reference to the Senate Report at issue. Appended to that article was a post-it note from Marlin Richardson requesting that an employee return the article to his box when he was done reading it. (Arman Aff. Exh. J.) On this basis, at least Defendants Spy Factory, Inc.

---

(14) wired cigarette papers; or (15) cocaine freebase kits.

**11.** Section 857(e) provides the following list of objective criteria to be used in determining whether a device constitutes drug paraphernalia:

> In determining whether an item constitutes drug paraphernalia, in addition to all other logically relevant factors, the following may be considered: (1) instructions, oral or written, provided with the item concerning its use; (2) descriptive materials accompanying the item which explain or depict its use; (3) national and local advertising concerning its use; (4) the manner in which the item is displayed for sale; (5) whether the owner, or anyone in control of the item, is a legitimate supplier of like or related items in the community, such as a licensed distributor or dealer of tobacco products; (6) direct or circumstantial evidence of the ratio of sales of the item(s) to the total sales of the business enterprise; (7) the existence and scope of legitimate uses of the item in the community; and (8) expert testimony concerning its use.
> 21 U.S.C. § 857(e).

**12.** *See e.g., Green v. Bock Laundry Machine Co.,* 490 U.S. 504, 528, 109 S.Ct. 1981, 1994, 104 L.Ed.2d 557 (1989) (Scalia, J., concurring in the judgment) ("The meaning of the terms on the statute books ought to be determined, not on the basis of which meaning can be shown to have been understood by a larger handful of the Members of Congress; but rather on the basis of which meaning is (1) most in accord with context and ordinary usage and thus most likely to have been understood by the whole Congress which voted on the words of the statute (not to mention the citizens subject to it), and (2) most compatible with the surrounding body of law into which the provision must be integrated...."). *See generally,* Bradley C. Karkkainen, "Plain Meaning": Justice Scalia's Jurisprudence of Strict Statutory Construction, 17 Harv.J.L. & Pub. Pol'y 401, 401 (1994). *But see United States v. Nadi,* 996 F.2d 548, 550 (2d Cir.1993) (plain meaning of statutory language can be confirmed by legislative history); *Information Providers' Coalition for Defense of the First Amendment v. Federal Communications Commission,* 928 F.2d 866, 874 (9th Cir.1991) (legislative history made clear that statutory term had judicially recognized meaning that was not unconstitutionally vague); *United States v. Gavin,* 959 F.2d 788, 791 (9th Cir.1992) (court considered legislative history in determining that statute was not unconstitutionally vague as applied), *cert. denied,* 506 U.S. 1067, 113 S.Ct. 1017, 122 L.Ed.2d 164 (1993); *United States v. Desurra,* 865 F.2d 651, 653 (5th Cir.1989) (legislative history made clear that drug was a "controlled substance" within meaning of statute).

and Marlin Richardson can be charged with constructive knowledge of the Report. *Cf. Hoffman Estates,* 455 U.S. at 495, 102 S.Ct. at 1191 ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law.").

Hence, because the concept of "primarily" has not been recognized as unconstitutionally vague in analogous situations and because the defendants cannot deny that they knowingly walked precariously on the line between lawful and unlawful conduct, I conclude that the phrase "primarily useful" is not unconstitutionally vague as applied to their conduct.

### 2. *The "Surreptitious" Language*

#### a) *Plain Meaning/Dictionary Definition*

According to Webster's Third New International Dictionary, "surreptitious" means:

> 1. marked or accomplished by fraud or suppression of truth. 2a. executed, obtained, used, done, or attended with often clever or deft circumvention of proper standards, sanction or authority: enjoyed by stealth: clandestine. b.: of fraudulently, spurious, or unauthorized issue: made or introduced fraudulently. c. acting in secret or by stealth: doing something clandestinely: sly, stealthy.

Webster's Third New International Dictionary 2302 (3d. ed. 1986); *see also United States v. Herring,* 993 F.2d 784, 786 (11th Cir.) (providing that "[a]lthough the term 'surreptitious' is not defined in the statute itself, its dictionary definition is well established: secret and unauthorized; clandestine; action by stealth or secretly.") (citing Shorter Oxford English Dictionary 2092 (3d ed. 1959), *cert. denied,* 510 U.S. 933, 114 S.Ct. 347, 126 L.Ed.2d 312 (1993)). This term, while perhaps not as commonly invoked as "primarily," has a clear meaning to the average person. It is not a term of degree; it does not even require one to distinguish between different levels of secrecy. In fact, it is not even possible to be partially "surreptitious."

Reduced to a single synonym, surreptitious merely means secret or clandestine.

For the present purposes, the only real difficulty with the term surreptitious arises from its connection to the concept of authority. As the dictionary definition underscores, when an actor acts in a surreptitious manner, he or she "execute[s] ... with often clever or deft circumvention of proper standards, sanction or *authority.*" Webster's Third New International Dictionary 2302 (3d. ed. 1986) (emphasis added). As noted, in construing Section 2512 in a satellite device case, the Eleventh Circuit also emphasized this notion of a lack of authority as crucial to the concept of surreptitiousness: "Although the term 'surreptitious' is not defined in the statute itself, its dictionary definition is well established: secret and *unauthorized;* clandestine; action by stealth or secretly." *Herring,* 993 F.2d at 786 (emphasis added). The difficulty in importing the concept of "authority" into "surreptitious" is that it begs the question of who or what is capable of granting "authority" in this context. Does authority mean authority under the law or does it mean the authority of the person or persons involved in the communication that is the subject of the interception implicating Section 2512? Do one or all of the participants in the "communication" have to grant "authority" in order for there to have been no "surreptitious" interception of the communication?

Clearly, it would be illogical if the authority concept in surreptitious referred to authority under the law. First, it does not make sense for a word in common parlance to require a familiarity with the law to invoke. Second, such a construction of authority does not comport with the common understanding of the term. Certainly there are situations in which particular conduct is authorized by the law but is nonetheless surreptitious: as, for example, with an undercover police officer. Surely his or her work is authorized by the law, but it is nonetheless patently surreptitious.

Then, if the authority in surreptitious does not refer to authority under the law, to what authority does it refer? The answer must

be that it refers to the authority of all persons involved in the communication. To take an apposite example, consider the following scenario: Jane and John are having a conversation and Jane is secretly recording everything John is saying. Meanwhile, Bill, without Jane *or* John's consent, is recording the same conversation. Who is "surreptitiously" recording? The obvious answer is that both Jane *and* Bill are surreptitiously recording. Bill is recording surreptitiously because he clearly has no person's authority to record the conversation. Jane, too, however, is recording surreptitiously because she does not have John's authority to record the conversation—even though she may have self-authority or even legal authority to do so. One could never say that just because Jane was a party to the conversation, her recording of John was not surreptitious. If, however, we changed the scenario, and both John and Jane agreed to record one another or they agreed for Bill to record them, then, clearly no one would be acting surreptitiously because there would be full authority to record—perhaps even if such a recording were forbidden under the law.

What does this tell us, then, about the plain meaning of "surreptitious" under the act? From this, we can discern that surreptitious as used in Section 2512 can only reasonably mean an interception that is accomplished without the consent, *i.e.*, authority, of *all* persons to the communication. As unsettling as this result might be on a pragmatic level—because devices primarily intended to record surreptitiously have become commonplace in the market—this is unequivocally the "plain meaning" of Section 2512.

In fact, the legislative history of the statute comports with this construction of the term surreptitious. Among the prohibited

devices that are included in the Senate Report to the bill, are "the microphone disguised as a wristwatch, ... cuff link, [and] tie clip...." S.Rep. No. 90–1097, 90th Cong., 2d. Sess., 95 U.S.C.C.A.N. 2112, 2183 (1968). These devices, which are deemed *per se* surreptitious by the Report, are patently devices that, in order to be used, most logically require the consent or authority of at least one party to the conversation. Unlike a picture frame, fountain pen, stapler, or cigarette pack, which are also mentioned in the list of prohibited devices, a wristwatch, cuff link and tie clip cannot merely be left behind to record the conversation of others. Rather, these devices, to be used, must more likely than not be worn by at least one party to the conversation. The fact that these devices are included within the intended purview of the act supports the conclusion that the act was intended to cover any device whose design renders it primarily useful for the interception of communications *without the consent or "authority" of all parties to that communication.*

### b) *Section 2512's Purported Conflict with Section 2511*

Defendants approach the alleged vagueness of Section 2512 from a different vantage point, however. They contend that any natural clarity to the term surreptitious is obfuscated by the conflict between Section 2512's prohibition of surreptitious *devices* and Section 2511's permission of some forms of surreptitious *interceptions*. They claim that the term "surreptitious" in Section 2512 is vague because it conflicts [13] with Section 2511(2)(d) which explicitly permits the interception of communications so long as least one party to the conversation consents to such intercep-

---

**13.** *Cf. Chalmers v. Los Angeles*, 762 F.2d 753 (9th Cir.1985) (striking down ordinance regulating vending activity on vagueness grounds where ordinance was in clear conflict with other city ordinance); *Mid–Fla Coin Exchange, Inc. v. Griffin*, 529 F.Supp. 1006, 1027 (M.D.Fla.1981) (providing that "[r]elated to the 'fair notice' requirement is the rule that inexplicably contradictory commands in statutes providing for criminal penalties will not be given legal effect.") (citing *Raley v. Ohio*, 360 U.S. 423, 438, 79 S.Ct. 1257, 1266, 3 L.Ed.2d 1344 (1959); *United States v.*

*Cardiff*, 344 U.S. 174, 176, 73 S.Ct. 189, 190, 97 L.Ed. 200 (1952)); *id.* at 1029 (striking down statute requiring both that records be preserved for three years after purchase and that records be submitted to the county sheriff within 24 hours of the purchase). *See generally,* Eric W. Treene, Note, Prayer–Treatment Exemptions to Child Abuse and Neglect Statutes, Manslaughter Prosecutions, and Due Process of Law, 30 Harv.J.Legis. 135, 171 (1993) (discussing vagueness and contradictory statutory commands).

tion.[14] The relevant portion of Section 2511 provides:

> It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

18 U.S.C. § 2511(2)(d). "Intercept" is defined under the statute to mean "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 21 U.S.C. § 2510(4). Defendants argue that this provision renders Section 2512's term "surreptitious" inscrutable because a person of ordinary intelligence could not discern what devices are legal and what devices are illegal under the statute. They contend that:

> there is not any distinction in 'surreptitiousness' as that word is defined, between *legal* (one-party consensual) interceptions and *illegal* interceptions. As a result, there is not any way for a person (and defendants herein) to distinguish between the primary design of a device intended for legal "surreptitious" recording or monitoring, *i.e.*, a concealable or disguised tape recorder and transmitter, and such a device designed for illegal 'surreptitious' purposes.

(Defs' Vagueness Mem. at 14).[15] Defendants insist that the disparate results in interpretation that arise from the apparent inconsistency between Section 2512 and Section 2511 "appear to depend more on context—the merchant from whom the item is purchased, and its ultimate use by the purchaser—rather than on any 'primary' design characteris-

---

**14.** The most common example of this form of interception would be if a person were to record a conversation in which he or she were a party. In addition, the statute also expressly permits the interception of conversations where one party to the conversation has previously consented to such interception.

**15.** Defendants' reliance upon *United States v. Gass*, 936 F.Supp. 810 (N.D.Ok.1996) for the proposition that a conflict in a similar statute suggests that Section 2512 unconstitutionally vague is misplaced. *Gass* involved 47 U.S.C. § 605(a), the predecessor to the communications act at issue here. Section 605(a) provided that "[e]xcept as authorized by chapter 119, Title 18, ... [n]o person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person." 47 U.S.C. § 605(a). The defendant in *Gass* was indicted and convicted of "modifying radio equipment and selling the devices to news organizations in Tulsa, for the purpose of eavesdropping on Tulsa's trunked radio system, including all of Tulsa's police frequencies and fire department communications." *Gass*, 936 F.Supp. at 810–11. After Gass was convicted under the Act, he moved for a judgment of acquittal on the ground that chapter 119 specifically provided that "it shall not be unlawful to intercept any radio communication which is transmitted 'by any governmental, law enforcement, civil defense, private land mobile, or public safety communications system, including police and fire, readily accessible to the general public.' " *Id.* at 811. The Court concluded that

this exception in chapter 119 should be read into the act and therefore that "the indictment against Gass cannot be criminal unless the government proves that the radio communications which Gass sought to intercept were not readily accessible to the general public." *Id.* at 813. In reaching its conclusion, the Court explained:

> If this Court were to give effect to the government's argument, then the governmental radio interception exception contained in Chapter 119 makes no sense; a person would be permitted under Chapter 119 to intercept police radio transmissions only to be subject to criminal prosecution under § 605. Why would Congress impose a ban on the interception and divulgence of radio communications in one statute, while allowing for a specific exception in another, if it did not intend for the statutes to be read together? The only way to avoid absurdity in such a case is to interpret the conflicting statutes to complement one another, thereby giving effect to the specific exception.

*Id.* at 812. Clearly, the purported conflict between Sections 2511 and 2512 does not rise to the level of conflict at issue in *Gass*, where there was no other possible way to resolve the tension between the two provisions. Rather, in the instant case, as will be discussed, there is no conflict between the two provisions. In fact, the Court in *Gass* specifically noted in a footnote that "this is *not* a case in which the particular federal law 'criminalizes the manufacture of items while leaving legal the use of such items' "—which is precisely the case here. *See id.* at 815, n. 3 (emphasis added).

tics." (Defs. Mem. at 15–16). These facts, they insist, "illustrate the unpredictability and inconsistency a citizen faces in determining in advance just what 'surreptitious' recording devices are proscribed by § 2512." (*Id.*).

The Government, in response, maintains that the so-called "consent exception" of Section 2511 should not be read into Section 2512 because the two provisions deal with entirely different matters: Section 2512 prohibits certain *devices* while Section 2511 authorizes certain *conduct.* Thus, the Government argues, there is no conflict between the two provisions because they deal with separate matters.[16]

The obvious difficulty with the Government's position is that it necessarily implies that Congress intended to make a device illegal while simultaneously protecting the use to which the device could or most likely would be put. Such an outcome appeared unpalatable to the Government at oral argument when it refused to say that certain devices sold by Radio Shack—which were largely indistinguishable from the devices sold by defendants—were prohibited by Section 2512. A construction of Section 2512 that does not incorporate Section 2511 significantly broadens the reach of Section 2512. However, even if the outcome might seem somewhat troublesome, (perhaps even imprudent for citizens accustomed to the availability of such devices for lawful consensual interceptions), it cannot be deemed illogical or irrational under the law. In fact, the legislative history overwhelmingly supports this construction.

As previously explained, the Senate Report lists as prohibited certain devices such as the cuff link, tie clip or wristwatch, which primarily function when used in a one-party consent situation. The only possible use for any of these devices is a perfectly *legal* inter-

ception under Section 2511. Nevertheless, even though they are by design not likely to be used to intercept *un*lawfully under Section 2511, the devices are nonetheless prohibited by Section 2512. The Senate Report provides some measure of explanation for this result. It explains that "[b]y banning these devices, a significant source of equipment highly useful for illegal electronic surveillance will be eliminated." S.Rep. No. 90–1097, 90th Cong., 2d. Sess., 95 U.S.C.C.A.N. 2112, 2183 (1968). While these words are not a model of clarity themselves, it is reasonable to conclude from them that it was Congress's intent in enacting Section 2512 to remove from the market a wide range of devices, some of which might be "primarily" useful for *legal* "surreptitious" interceptions under Section 2511 so that the greater good of preventing *illegal* interceptions might be more easily accomplished. Such an empirical and policy determination is certainly within the province of Congress to make and may not, without more evidence of a clear contradiction, be questioned here.

The D.C. Circuit Court of Appeals has reached a similar conclusion in a somewhat analogous case in 1974. There, the Court was concerned with the interplay between Sections 2512 and 2511 in the context of a prosecution for advertising devices that were prohibited under Section 2512. An argument much like the one offered here was offered by the defendants in that case. The district court held that "the advertising prohibition of § 2512 should not be read to prohibit the promotion of uses apparently lawful in light of the 'consent exception' of § 2511(2)(d)." *United States v. Bast,* 495 F.2d 138, 141 (D.C.Cir.1974). The Circuit Court reversed this ruling, noting that:

> The mere fact that a device may be used for interceptions that do not violate § 2511 does not mean that its manufacture and advertising are compatible with § 2512.

---

16. At oral argument, the Government also maintained that even considering the defendants' argument regarding the conflict between Sections 2511 and 2512, under a vagueness-as-applied analysis, the defendants challenge would still fail because the devices at issue here all have a design which renders them primarily useful for *illegal* surreptitious interceptions, *i.e.,* ·interceptions without the consent of any party to the communication. Even if the Court had accepted defendant's contention that Section 2511 limits Section 2512, the Government is correct that the defendants' vagueness challenge would fail if the Government were to prove at trial, as they maintain they would be prepared to do, that the devices seized from the defendants had no other primary purpose than illegal interceptions.

Section 2512(1)(b) prohibits the manufacture, sale and possession of devices primarily useful for the purpose of secret interception, even though the devices may be used for other and lawful interceptions. The intent of Congress is discernable and sensible, and there is no reason to consider the doctrines that indicate that when plain meaning leads to an absurd result it does not signify applicable legislative intent. Similarly, there is no anomaly in Congress's apparent attempt, in the advertising prohibition of § 2512(1)(c)(ii), to reach promotion of device for secret interception, even though the manufacture or possession of the device is not banned by § 2512(1)(b) as one "primarily" useful for secret interception. It may be unusual but it is not unprecedented for Congress to prohibit the advertising of a product even though it has not prohibited the product or its use per se. An example that looms large currently is the prohibition of advertising of cigarettes on radio or television. . . . The legislative history supports the interpretation of § 2512 without limitation by the exceptions contained in § 2511. . . . Thus, the manufacture, sale and possession prohibition was intended to ban particular devices, among them eavesdropping equipment which could be worn on the person by a party to a conversation, and hence used in a manner which would not violate § 2511 because of its "consent exception."

*Id.* at 143–44.

■ In sum, despite the unattractive result of such a broad construction of Section 2512 to many stores and consumers in the marketplace, the Court finds no ambiguity in the term "surreptitious" because there is no conflict between Sections 2511 and 2512. Defendants nevertheless maintain that because Section 2512 begins with the words "[e]xcept as otherwise specifically provided in this chapter," Section 2511 must be read into Section 2512. These words, however, are only important if a separate section of the chapter provides a different instruction. Such is not the case with Section 2511. The two provisions do not conflict because they speak to different methods and different purposes. Section 2512 casts a wide net over a variety of devices so that end of Section 2511—the prohibition of nonconsensual wiretapping—can be effectuated.[17] In the end, the plain meaning of "surreptitious" is clear—even if it might produce a bitter result for those searching to effect the authority granted to them under Section 2511. Such persons are left with recording their conversations with perhaps cumbersome devices, like dictaphones and tape recorders, and prohibited from using more efficient and less cumbersome devices like bugs. Section 2512, however, authorizes only electronic communications providers and government officials to manufacture, sell or possess the more efficient bug devices, *see* 18 U.S.C. 2512(2), while Section 2511 permits electronic communications providers, government officials *and* private parties with consent, to intercept communications.

### 3. The Potential for Arbitrary and Discriminatory Enforcement

■ Invoking the second element of the vagueness-as-applied test, the defendants assert that the inherent vagueness of Section 2512 is evidenced by the arbitrary and discriminatory enforcement of the statute that has occurred to date. Defendants note that other merchants sell and advertise the same or virtually similar products, yet the Government has not prosecuted them. At oral argument, defense counsel showed the Court products from well-known stores, like Radio Shack and Hammacher Schlemmer, which defense counsel argued were virtually indistinguishable from the devices at issue here (12/13/96 Tr. at 93–101). In their submission, defendants ask the rhetorical question, "Does a product become primarily useful for surreptitious interception under 2512 by virtue of the store in which it is sold?" (Defs' Vagueness Mem. at 21). The defendants also point to the fact that some of the very

---

**17.** Further support for the contention that Sections 2512 and 2511 were not to be read in conjunction with one another lies in the fact that the two sections provide duplicative exceptions which would have been unnecessary if Congress had intended to have the sections read in light on one another. *Compare* 18 U.S.C. § 2512(2) *with* 18 U.S.C. § 2511(2).

items [18] that were charged in the Indictment, and which were seized in the April 5, 1995 searches and seizures of the Spy Factory Stores in Seattle, were returned by Customs officials to Spy Factory several months later. At oral argument, defense counsel claimed that this was compelling evidence of the ambiguity of Section 2512, arguing that "the government's reading of 2512 virtually renders [the devices] contraband, because the mere possession of it, knowing its surreptitious use, is a felony. So, if it's contraband, why is the regional counsel ordering it returned?" (12/13/96 Tr. at 118). Defendants claim that the return of these devices amounts to "classic vagueness in the form of arbitrary and discriminatory enforcement: two law enforcement officers, applying the same statute to the same item, reach different conclusions as to its legality." (Defs.' Vagueness Mem. at 2).[19]

The Government explains that "the reason devices were returned to the Spy Factory in Seattle was not based on a determination that the devices in question were not [covered by the statute]. Rather, the Customs Service's district counsel in Seattle, Washington, erroneously determined that, *inter alia*, absent a conviction, there was no basis for forfeiture of the [devices], and the

Western District of Washington had declined prosecution of the local store employees." (Govt Mem. at 34). This response, of course, does not answer the defendants' argument that if the statute were sufficiently clear, such devices would self evidently be contraband, and no ambiguity regarding potential forfeiture should have existed, as it would not have existed in the case of illegal drugs, for example.[20] However, as the Government points out in its Memorandum of Law, "[t]he fact that differing minds may reach different results when applying the statutory factors 'does not render a statute void for vagueness.'" (Govt Mem. at 33 (citing *United States v. 3520 Brighton Boulevard*, 785 F.Supp. 141, 144 (D.Colo.1992))). "The 'Constitution' prohibits arbitrary and discriminatory application of the law; it does not insist upon mathematical certainty." *Id.*

In summary, although I am somewhat troubled by aspects of the enforcement of this law—particularly given the broad construction of the statute I find myself impelled to accept—I cannot find that the actions by either the law enforcement community or the prosecutors is "arbitrary or discriminatory," as that concept is understood in the vagueness context. There is a perfectly understandable reason why officers and prosecu-

18. Defendants state that "[f]our of [the products returned] were identified specifically in Agent De Arman's Affidavit as ESIDs: (1) VT–75 transmitter . . .; (2) Micro CAL–201 calculator/transmitter . . .; (3) Micro TX–6 telephone transmitter . . .; and (4) pen microphone. . . . In addition, other items returned also closely resemble the type of devices Agent De Arman's Affidavit considers ESIDs: transmitters; . . . an 'artificial plant transmitter' . . .; a 'phone clip' . . .; and 'telephone interception' devices . . ." (Defs.' Vagueness Mem. at 18).

19. As further evidence of the ambiguity of the statute, defendants point to the fact that the Senate Report accompanying the statute commends the use of expert testimony to determine what devices are covered under the statute. *See* S.Rep. No. 90–1097, 90th Cong., 2d. Sess., 95 U.S.C.C.A.N. 2112, 2183 (1968) ("Obviously, the sort of judgment called for here in close cases would warrant the use of expert testimony."). Defendants claim that "[o]bviously, if expert opinion is required, arbitrary and discriminatory enforcement in the field is effectively guaranteed." (Defs. Mem. at 18–19). However, the use of expert testimony to provide concreteness to the gray areas at the margin of statutes is well

recognized in the law. *See e.g., United States v. Santos*, 64 F.3d 41 (2d Cir.1995) (relying in part on expert testimony at trial to determine that weapon used was a "silencer" within meaning of statute found not unconstitutionally vague), *vacated on other grounds*, —— U.S. ——, 116 S.Ct. 1038, 134 L.Ed.2d 186 (1996); *United States v. Jackson*, 968 F.2d 158, 162 (2d Cir.) (in context of vagueness challenge, placing emphasis on fact that "according to expert testimony, 'cocaine base' has a precise definition in the scientific community."), *cert. denied*, 506 U.S. 1024, 113 S.Ct. 664, 121 L.Ed.2d 589 (1992).

20. I note, as did defendants, that at oral argument, the lead assistant United States attorney hesitated at length and could not provide a quick or confident answer as to whether a certain device bought from Radio Shack fell under the statute or whether the term "surreptitious" included both legal and illegal interceptions under Section 2511. (12/13/96 Tr. at 128–132). I am troubled by the assistant United States attorney's hesitancy, but in the end I attribute it to misplaced caution in committing himself without the contextual facts rather than to any lack of certainty regarding the correct interpretation of Section 2512.

tors seek convictions of defendants like the Spy Factory and not institutions like Radio Shack and Hammacher Schlemmer: because the Spy Factory, by its very name, and in countless other ways evidenced in the Government's papers, sets itself out as a place where one might be more likely to locate devices that can be used for illegal, rather than legal, purposes.

The Supreme Court has noted that the "primary" use of an item may be discernable in part from where it is sold and how it is marketed. The Court said in a footnote in *Posters 'N' Things*, "[t]hus, while scales or razor blades as a general class may not be designed specifically for use with drugs, a subset of those items *in a particular store* may be 'primarily intended' for use with drugs by virtue of the circumstances of their display and sale." *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 521 n. 11, 114 S.Ct. 1747, 1752 n. 11, 128 L.Ed.2d 539 (1994) (emphasis added) (also providing that "it is the likely use of customers generally, not any particular customer, that can render a multiple-use item drug paraphernalia."). *See also United States v. Schneiderman*, 968 F.2d 1564, 1566 (2d Cir.1992) ("To show a defendant 'primarily intended' to sell drug paraphernalia, the government need not show that the items would necessarily be used in connection with illegal drugs, but it must prove that the defendant knew there was a strong probability the items would be so used."), *cert. denied*, 507 U.S. 921, 113 S.Ct. 1283, 122 L.Ed.2d 676 (1993). This insight speaks strongly to the defendants' contention that Radio Shack, Hammacher Schlemmer and other stores have not been prosecuted for selling equipment similar to the instant devices. (12/13/96 Tr. at 93–100). Therefore, even though Section 2512 might permit the prosecution of Radio Shack and Hammacher Schlemmer and other institutions selling similar devices,[21] it is perfectly rational, and perhaps even prudent, for law enforcement officials to concentrate their efforts on the defendants who are not only most likely to be convicted, but also are most likely to serve a clientele bent on illegal practices. *Cf. Richmond Boro Gun Club,*

*Inc. v. City of New York*, 97 F.3d 681, 686 (2d Cir.1996) ("New York City may choose to limit enforcement of the local law to weapons clearly proscribed by the law...."); *United States v. Wynn*, 633 F.Supp. 595, 604 (C.D.Ill.1986) (in prosecution under Section 2512, addressing argument that defendant's devices were "equivalent to the commercially available Radio Shack FM Wireless Microphone," the court provides that "[e]ven assuming that the items are similar—which this court can easily see they are not—this in no way rebuts the fact that they [fall under § 2512].... The fact that one person is not prosecuted for his possible criminal conduct does not immunize another for engaging in the same or similar conduct.'"). For these reasons, I do not find that the defendants have shown the potential for arbitrary and discriminatory enforcement that is of the sort necessary to strike the statute for vagueness.

### 4. Scienter

As previously noted, it is well established that "'the constitutionality' of a vague statutory standard is closely related to whether that standard incorporates a requirement of mens rea.... In fact, the inclusion of an intent provision will often save an otherwise vague statute." *United States v. Schneiderman*, 968 F.2d 1564, 1566 (2d Cir.1992). Section 2512 provides such a scienter requirement. Although it is true, as defendants argue, that the "knowing or having reason to know" language means little if the term "surreptitious" is unclear, given that the Court has found that the terms "surreptitious" and "primarily useful" are clear upon their plain meanings, the scienter requirement of Section 2512 is yet another factor supporting a rejection of defendants' vagueness challenge. Further, as applied, there is a great deal of evidence proffered by the Government suggesting that the defendants were aware that they were treading perilously close to the line of lawful conduct. (Govt Mem. at 22–27). *See United States v. Strauss*, 999 F.2d 692, 698 (2d Cir.1993) (vagueness challenge "'may be overcome in any specific case where reasonable persons

---

**21.** And this should have been the Assistant United States Attorney's immediate response to my inquiry at oral argument, given the Government's position in its written submissions.

would know that their conduct is at risk.'") (quoting *Maynard v. Cartwright,* 486 U.S. 356, 361, 108 S.Ct. 1853, 1857, 100 L.Ed.2d 372 (1988)); *Boyce Motor Lines v. United States,* 342 U.S. 337, 340, 72 S.Ct. 329, 330–31, 96 L.Ed. 367 (1952). While this evidence and any counter-evidence will be more appropriately presented at trial, for the moment I find that the statute as applied to these defendants is not unconstitutionally vague.

## CONCLUSION

For the reasons provided, the defendants' motion for a change of venue is **DENIED,** and defendants' motion to dismiss portions of the Indictment premised on Section 2512 on the ground of vagueness is **DENIED.**

**SO ORDERED.**