**UNITED STATES of America**

**v.**

**Millard Clifford HALEY, Francis William Hewes, II, Andrew J. Delosky, Howard E. Caldwell, Ted Michael Ferrell, a/k/a Franklin K. Harris, Robert Lee Nations, Craig A. Cloninger, William T. Brooks, Gene M. Simpson, Thomas Glenn Chester, James F. Brannon, Jr., Luther Eugene Hickey, Carl S. DeMarchi, Frank Pytryga, William L. Warner, Walter Langford, John Carroll Craver, Roger Boone, Charles Franklin Caldwell, Gerrold H. Pettus, Michael Dalessandro.**

**Crim. No. 80–00071.**

United States District Court,
E. D. Pennsylvania.

Jan. 7, 1981.

Alfred A. Gollatz, Curtis E. A. Karnow, Elizabeth K. Ainslie, Asst. U. S. Attys., Philadelphia, Pa., for the U. S.

Michael A. Seidman, Philadelphia, Pa., for Clifford Haley.

Timothy P. Booker, Philadelphia, Pa., for F. W. Hewes, II.

David R. Eshelman, Reading, Pa., for Howard E. Caldwell.

Raul LeRow, Atlanta, Ga., for W. T. Brooks.

Paul M. Yatron, Shillington, Pa., for Gene M. Simpson.

Michael vonMoschzisker, Philadelphia, Pa., for Walter Langford.

Margaret M. Boyce, Philadelphia, Pa., for C. F. Caldwell.

## MEMORANDUM AND ORDER

TROUTMAN, District Judge.

American colonists, incensed by King George III's disregard of their historic rights as Englishmen, justified the American Revolution by submitting "the Facts to a candid world" in the Declaration of Independence, in which they listed and decried "repeated injuries and usurpations, all having in direct object the establishment of an absolute Tyranny". One particularly offensive and universally detested practice included transportation "beyond [the] Seas to be tried for pretended offenses". To protect citizens of the new nation from a similar abuse, the framers of the American Constitution inserted a provision requiring that trial be held in the state where the crime was committed.[1] Essentially a venue requirement, Article III's mandate safeguards against the "unfairness and hardship" accompanying a prosecution brought in a remote place.[2] To prevent encroachment upon this right, the early amendments to the Constitution further conferred upon an accused not only the rights to a speedy and public trial but also to "an impartial jury of the state and district wherein the crime shall have been committed".[3] Embodying these constitutional precepts, Fed. R.Crim.P. 18 provides in relevant part that "the prosecution shall be had in a district in which the offense was committed". Given this historic commitment, when an accused challenges the propriety of venue in a criminal case, the matter deserves plenary consideration.

Where the Government alleges a multi-district conspiracy venue is proper in any district in which a co-conspirator has committed overt acts.[4] However, the mere fact of proper venue in the district where the Government brings the prosecution does not require that trial be held therein. Fed. R.Crim.P. 21(b) provides in relevant part that "for the convenience of the parties and witnesses, and in the interests of justice, the court upon motion of the defendant may transfer the proceeding as to him ... to another district". Interpreting this rule in *Platt v. Minnesota Mining & Manufacturing Co.*,[5] the Supreme Court delineated ten relevant factors, which include location of defendants, possible witnesses, counsel, events likely to be in issue and documents and records likely to be involved. In addition, the disruptive impact upon a defendant's business unless the court transfers the case, expense to the parties, the relative geographic accessibility of the place of trial, docket conditions in the involved districts or divisions, and any other "special factors"[6] possibly affecting transfer should be considered. Exercising broad discretion in deciding transfer motions,[7] courts will upset the Government's choice of forum only upon a showing by defendants of "substantial inconvenience".[8]

In the case at bar, the Government, in a complex fifty-two count indictment, originally charged twenty-one defendants with various violations of the Racketeering Influenced and Corrupt Organizations Act (RICO),[9] conspiracy to violate the Act,[10]

---

1. U.S.Const. art. III, § 2, cl. 3.

2. *United States v. Cores*, 356 U.S. 405, 407, 78 S.Ct. 875, 877, 2 L.Ed.2d 873 (1958).

3. U.S.Const. Amend. VI.

4. *United States v. Boyance*, 329 F.2d 372, 375 (3d Cir.), *cert. denied sub nom. Feldman v. United States*, 377 U.S. 965, 84 S.Ct. 1645, 12 L.Ed.2d 736 (1964), *United States v. Bloom*, 78 F.R.D. 591, 607 (E.D.Pa.1977).

5. 376 U.S. 240, 243–44, 84 S.Ct. 769, 771–72, 11 L.Ed.2d 674 (1964).

6. These general principles, although announced within the context of a corporate defendant, apply equally to individual defendants. *United States v. Aronoff*, 463 F.Supp. 454, 457 (S.D.N.Y.1978).

7. *United States v. Green*, 373 F.Supp. 149, 153 (E.D.Pa.), *aff'd*, 505 F.2d 731 (3d Cir. 1974), *cert. denied*, 420 U.S. 978, 95 S.Ct. 1405, 43 L.Ed.2d 659 (1975).

8. *United States v. Bloom*, 78 F.R.D. at 608, *United States v. Green*, 373 F.Supp. at 154.

9. 18 U.S.C. § 1962(c).

10. 18 U.S.C. § 1962(d).

mail fraud,[11] wire fraud,[12] interstate transportation of stolen property,[13] and receipt of stolen goods.[14] Entries of guilty and *nolo contendere* pleas have reduced the number of defendants to seven.[15]

Specifically, the Government accused defendants of operating a network of "bust-out" corporations through which individual defendants fraudulently obtained favorable credit ratings for their businesses with the help of co-defendants and then purchased wholesale goods on credit which they sold for cash at prices below wholesale. To placate victim manufacturers who demanded payment for goods, defendants "lulled" them by promising that funds would be forthcoming. The indictment further charged that defendants "took down" the corporations by formally filing for bankruptcy or simply disappearing. Defendants, all indigent with court-appointed counsel and residing in the Northern District of Georgia, assert generally that the "interests of justice" will be better served by trial in their home district and therefore move for transfer pursuant to Fed.R.Crim.P. 21(b). Essentially defendants argue that they cannot afford the cost of travel to and living in the Eastern District of Pennsylvania for the duration of a lengthy trial. Defendants further contend that witnesses cannot afford to appear on their behalf in such a distant forum and that forcing them to trial in this district contravenes the purpose of Rule 21(b) by denying them a fair trial.[16]

■ Examination of the *Platt* factors [17] compels the conclusion that trial in the Northern District of Georgia comports with the purpose of the Rule and conduces to affording defendants a truly fair trial. First, all remaining defendants reside in the Northern District of Georgia; all have moved for transfer to their home district. Although this particular fact has no "independent significance",[18] it nevertheless deserves "real weight".[19]

Second, the location of possible witnesses strongly militates in favor of transfer. Generally, a naked allegation that witnesses will be inconvenienced by trial in a distant forum will not suffice for transfer. In order to exercise sound discretion in deciding the motion, courts must be well informed. Hence, transfer motions must identify inconvenienced witnesses whom defendants propose to call [20] and contain a "showing" of the proposed witnesses' testimony.[21] Defendants must offer specific examples of witnesses' testimony and their inability to testify because of the location of trial.[22] In short, in order to make an informed decision regarding the necessity of those defense witnesses who would be inconvenienced or unable to attend trial absent transfer, the court must rely on "concrete demonstrations" of the proposed testimony.[23]

---

**11.** 18 U.S.C. § 1341.

**12.** 18 U.S.C. § 1343.

**13.** 18 U.S.C. § 2314.

**14.** 18 U.S.C. § 2315.

**15.** Defendants Haley, Hewes, H. Caldwell, Brooks, Simpson, Langford and C. Caldwell have entered pleas of not guilty and seek transfer. Defendants Ferrell, Pettus, Dalessandro, DeMarchi, Hickey, Nations, Pytryga, Craver, Boone, Brannon, Cloninger, Delosky, Warner and Chester have all entered pleas of guilty or *nolo contendere.*

**16.** *See United States v. Hinton*, 268 F.Supp. 728, 731 (E.D.La.1967).

**17.** *See* n. 5.

**18.** *Platt v. Minnesota Mining and Manufacturing Co.*, 376 U.S. at 245–46, 84 S.Ct. at 772–73.

**19.** *United States v. Barrientos*, 485 F.Supp. 789, 791 (E.D.Pa.1980).

**20.** *United States v. Kelly*, 467 F.2d 262, 265 (7th Cir. 1972), *cert. denied*, 411 U.S. 933, 93 S.Ct. 1905, 36 L.Ed.2d 393 (1973).

**21.** *Jones v. Gasch*, 404 F.2d 1231, 1243 (D.C. Cir.1967), *cert. denied*, 390 U.S. 1029, 88 S.Ct. 1414, 20 L.Ed.2d 286 (1968).

**22.** *United States v. Barrientos*, 485 F.Supp. at 790 n. 2.

**23.** *Jones v. Gasch*, 404 F.2d at 1243. The court accordingly requested that defendants submit affidavits containing the requisite information. The affidavits have been impounded in order to protect defendants' theories of defense. Our lack of specificity in describing the contents of the documents is grounded in the same concern.

In the case at bar, defendant Haley avers by affidavit that he proposes to call at trial an attorney, a medical doctor, a businessman, friend, various consumers and a prison guard who would be willing to testify on his behalf in Atlanta but are either too poor or too busy to travel to the Eastern District of Pennsylvania.

Defendant Hewes currently proposes to call thirty witnesses from North Carolina, thirteen from Georgia, six from South Carolina and one each from Tennessee and Alabama. All of these witnesses would willingly travel the comparatively short distance to testify in Atlanta while purportedly being unwilling to travel to this district for like purposes. These proposed witnesses include representatives from credit agencies, salesmen for nationally prominent firms who had business dealings with defendant, bank officers who verified defendant's financial statements, a printer who will state that false information was given to the FBI, a company president to whom the FBI made misrepresentations as well as various other factual and character witnesses.

Defendant Howard Caldwell, currently incarcerated at the federal correctional institute in Lexington, Kentucky, asserts that his two "fact" witnesses and six "character" witnesses all are unable or unwilling to invest the time and money to travel to this district and testify on his behalf. However, each of these witnesses, as with other defendants, would be available to testify at a trial held near their homes in the Northern District of Georgia. His proposed witnesses include members of the business community, former employers and employees, an attorney and a former Justice Department employee.

Defendant Brooks asserts that twenty-six witnesses, including numerous attorneys, judges, a police chief and former employees of "Rekcus", one of the corporations allegedly formed for the purpose of bankruptcy,[24] would be willing to testify on his behalf if trial were held in Atlanta. Business commitments preclude these witnesses' testimony if trial were held in this district.[25]

Defendant Simpson plans to call nine witnesses, including a medical doctor, a law enforcement official, a banker, former employee and friends. He complains that occupational commitments make attending trial in this district a "serious inconvenience" for them, although they could and would attend trial in the Northern District of Georgia.

Defendant Charles Caldwell proposes to call five fact witnesses, including bankers, accountants and four character witnesses. None of them will be able to testify unless the pending motion is granted.[26]

These affidavits uniformly reveal that proposed defense witnesses are available, willing and able to testify in the Northern District of Georgia while being unavailable, unwilling and unable to testify in the Eastern District of Pennsylvania. Even allowing for some overstatement of defense counsels' case and the number of possible defense witnesses, their background and proposed testimony demonstrate the unfairness and injustice of requiring trial in this district. Although it is unlikely that all

24. Defendant Brooks allegedly selected the name for its meaning spelled backward.

25. The involvement of defendant Brooks in the scheme alleged by the Government centers primarily around his position as an attorney: incorporating various entities knowing that they would operate as "bust outs", filing a bankruptcy petition on behalf of an alleged "bust-out" corporation and merging two "bust-out" companies in order to "lull" or pacify increasingly apprehensive creditors. Brooks, the only attorney named as a defendant, is in somewhat of a unique category in that his involvement with co-defendants is easily documented through various court records which he filed in representing the corporate entities. However, reviewing the documents could lead to the inference that defendant Brooks merely represented a number of corporations in his years as an attorney and that some of them were less than successful.

26. Defendant Langford has failed to support his motion with appropriate affidavits notwithstanding the court's instruction that he do so. He has, however, attested to his poverty and lack of funds in his successful application for CJA appointment of counsel.

proposed character witnesses would be necessary or permitted to testify,[27] the court trying this case may elect not to exclude all such "cumulative" evidence since defendant's *mens rea*, or the lack thereof, is central to the Government's case. Accordingly, the admission of character evidence, normally limited due to its cumulative nature, may well be properly admitted with greater latitude.

Moreover, inconvenience to Government witnesses seems minimal. Some "victim" witnesses, scattered throughout the country, will be inconvenienced to some extent by *any* choice of forum and the FBI agent in charge of this investigation, formerly stationed in Pennsylvania, has been transferred recently to Louisiana. He would, no doubt, find trial in Pennsylvania no less inconvenient than in Georgia.

The third *Platt* factor, the location of events likely to be in issue, also favors transfer. Many of the overt acts described in the indictment purportedly occurred in Georgia or surrounding states. Importantly, Georgia, the state from which defendants hail, appears to be the "nerve center" of the alleged illicit operations.[28] The location of documents, another *Platt* factor, is neutral, neither favoring nor opposing transfer. The Government's documents are currently located in Allentown, Pennsylvania, many of them having been moved there from Georgia. Defendants' documents, however, remain located in their custody in the South. The task of returning the Government's documents to Georgia is not so burdensome as to warrant denial of transfer and to order indigent defendants to trial in a distant forum and require that they bring all possible relevant documents for immediate use at trial would impose an additional and unreasonable burden which they assert they are unable to meet.

Similarly, the fifth factor—location of counsel—neither impels nor resists transfer. Six of the seven remaining defendants have Philadelphia counsel appointed under the Criminal Justice Act (CJA).[29] The seventh defendant's CJA attorney is located in Atlanta. In the event of transfer, the Georgia court may consider appointing local counsel. If so, presently retained attorneys will no doubt acquaint substitute counsel with the case. In fact, Philadelphia counsel have stressed their willingness to inform newly-appointed Southern counsel with the status and background of the prosecution.

Sixth, the disruptive impact upon defendants' businesses by trial in this district, also favors transfer. Each of the defendants, although qualifying for CJA counsel, are either marginally employed or own and operate struggling businesses.[30] One defendant proposes to continue pumping gas at night during the trial in order to support himself; another states that trial in Pennsylvania would be "financially devastating"; a third contends that, if the transfer motion is denied, he would be "unable to earn any livelihood whatsoever". Finally, one defendant would be forced to "shut down" his business in order to attend trial in Pennsylvania. Courts recognize that "personal involvement, even a few hours each weekday plus weekends could make a substantial difference" to the success of a struggling business.[31] Defending criminal charges should not include the penalty of financial ruin where the trial might be conducted properly and legally in a forum near defendants' homes and businesses.

Continuing, *Platt* also suggests consideration of the expense to the parties. Although transfer would possibly entail some additional trial costs for the Government, the Government has not demonstrated that trial in Georgia would be significantly more expensive than in Pennsylvania. On the

---

27. *United States v. Alter*, 81 F.R.D. 524, 527 (S.D.N.Y.1979), *United States v. Aronoff*, 463 F.Supp. at 458, *United States v. Bloom*, 78 F.R.D. at 609.

28. *United States v. Alter*, 81 F.R.D. at 562.

29. 18 U.S.C. § 3006A.

30. Defendant Howard Caldwell, presently incarcerated, is the only exception.

31. *United States v. Aronoff*, 463 F.Supp. at 459.

other hand, one defendant has calculated that simply *calling* his witnesses to Pennsylvania will cost over nine thousand dollars and that the additional costs associated with *housing* them will be a further burden which he is simply unable to bear.[32] Regrettably and importantly, the modicum of economic relief afforded indigent defendants under federal law fails to remedy the "fundamental disadvantage" created by the "comparative financial burdens" placed upon defendants if forced to trial in this district.[33] Under 18 U.S.C. § 4285 the court may order "noncustodial transportation" of indigent defendants to trial by the United States Marshal and further allows the court to direct the Marshal to furnish defendant "an amount of money for subsistence expenses *to* his destination".[34] However, the statute does not authorize subsistence funding for defendants once they arrive at the place of trial and during trial, which could be extended. Neither does the statute provide funds for transportation and support of defendants' witnesses to, during and throughout the trial.

However, defendants may move the court, pursuant to Fed.R.Crim.P. 17(b), to order payment of fees for defense witnesses where "the presence of the witness is necessary to an adequate defense".[35] Unfortunately, the ameliorative effect of these procedures fails to offset the economic hardship accruing to defendants by virtue of attending a lengthy trial far from home. To lessen this impact and the concomitant prejudice which inures to indigent defendants, the Government may offer to pay travel and subsistence expenses for defendants and their witnesses. Indeed, the Government has done so in other instances where it opposed a motion to transfer.[36] Significantly, no such offer has been forthcoming in this case and, upon inquiry, counsel for the Government has adamantly refused to make such funds available to these indigent defendants.

The next two *Platt* factors, the relative geographic accessibility of the place of trial and docket conditions in each district, are also neutral since the Eastern District of Pennsylvania is as accessible as the Northern District of Georgia. The Speedy Trial Act[37] has negated, in reality, any real concern for docket conditions.[38]

Finally, two "special factors" favor transfer. One defendant recently underwent two emergency abdominal operations and requires close medical supervision, which would necessarily be diminished by trial in a distant forum; the wife of another defendant is seriously ill and requires his care.[39] Additionally, of the original twenty-one defendants, only two were from Pennsylvania, and they have entered guilty pleas. If these two Pennsylvania defendants had not been indicted with this host of Southern

---

32. In considering the expense to defendants, neither the size nor existence of the expense is dispositive of the motion. Rather courts are concerned with defendants' *ability* to bear the expense. *United States v. Culoso*, 461 F.Supp. 128, 136 n. 12 (S.D.N.Y.1978).

33. *United States v. Barrientos*, 485 F.Supp. at 791.

34. On several occasions the court has ordered the Marshal to provide such funds to afford defendants the opportunity to attend pre-trial proceedings.

35. *See United States v. Pitts*, 569 F.2d 343, 349 n. 10 (5th Cir.), *cert. denied*, 436 U.S. 959, 98 S.Ct. 3076, 57 L.Ed.2d 1125 (1978) and *United States v. Martin*, 567 F.2d 849 (9th Cir. 1977). *See also* 7 *Guidelines for the Administration of the Criminal Justice Act* § 3.13.

36. *See United States v. Wheaton*, 463 F.Supp. 1073, 1078–79 (S.D.N.Y.), *aff'd*, 614 F.2d 1293 (2d Cir. 1979).

37. 18 U.S.C. § 3161 *et seq.*

38. On April 3, 1980, pursuant to 18 U.S.C. § 3161(h)(8)(B)(ii) and (iv) the Court ordered that the complex nature of the case warranted a continuance which excluded periods of delay from computation of time under the Act. Any delay resulting from the transfer to the Northern District of Georgia will likewise be excluded. *See* 18 U.S.C. § 3161(h)(1)(G).

39. *United States v. Ashland Oil Co.*, 457 F.Supp. 661, 663 (W.D.Okla.1978).

defendants, the prosecution would likely have been brought in a southern district.[40]

Careful weighing of these ten *Platt* factors impels the conclusion that the convenience of the parties and the interests of justice do, indeed, require transfer under these circumstances. Accordingly, defendants' motions to transfer will be granted.

---

**40.** *United States v. Barrientos*, 485 F.Supp. at 791.