**UNITED STATES of America**

v.

**Thomas Ray COFFEE, et al.**

Nos. CRIM.A. 99–389–01, 99–389–02, 99–389–03, 99–389–04 and 99–389–05.

United States District Court, E.D. Pennsylvania.

Sept. 8, 2000.

Nelson Thayer, Asst. U.S. Atty., United States Attorney's Office, Philadelphia, PA, for Government.

Edson A. Bostic, Defender Association of Philadelphia, Federal Court Division, Philadelphia, PA, Lee Mandell, Philadelphia, PA, Salvatore C. Adamo, Philadelphia, PA, J. Scott O'Keefe, Philadelphia, P.A, James S. Ettelson, Philadelphia, PA, for Defendants.

*MEMORANDUM*

DALZELL, District Judge.

In this criminal case, defendant Thomas Coffee has moved, pursuant to Fed. R.Crim.P. 21(b), to transfer this case to the United States District Court for the Southern District of Ohio where he and his co-defendants live. These other defendants, family members Naomi Coffee, Bradley Coffee, Jeramy Coffee, and the family corporation, TCMG, Inc., have joined in Thomas Coffee's motion. The Government vigorously opposes transfer, and after a hearing this day at which we heard argument and received supplemental information, we have concluded that, on balance, the convenience of the parties and witnesses, and especially the interest of justice, warrant transfer.

*Background*

This case involves the Coffees' alleged fraud regarding the purchase, repair, and resale of aircraft antennas that are used with communications and navigation equipment in both commercial and military applications. Specifically, Count I of the Indictment alleges that the Coffees were involved in a conspiracy, in violation of 18 U.S.C. § 371, to cause to be delivered through interstate commerce packages containing aircraft parts in furtherance of a scheme or artifice to defraud and to obtain money or property by means of false and fraudulent pretenses and representations, as well as to cause telephone communications to be transmitted in interstate commerce in furtherance of a scheme or artifice to defraud.

Among the alleged overt acts in furtherance of this conspiracy, the Indictment claims that between July of 1995 and December of 1997, Bradley Coffee, Jeramy Coffee and TCMG performed unauthorized antenna repairs and also sold antennas with false documentation. The Indictment also claims that in August of 1995 Thomas Coffee, using an alias, ordered three hundred blank data plates which falsely purported to be for antennas manufactured by Litton Aero Products.

According to the Indictment, on December 5, 1995, Thomas and Bradley Coffee, again allegedly using aliases, caused a purchase order to be faxed to TCMG from Windward Air, an aircraft parts distributor in Coconut Creek, Florida. On December 5, 1995, TCMG, in turn, sent an aircraft antenna, referred to in the Indictment as "Antenna One", to Windward Air, and the Coffees, using aliases, collected payment and signed the false documentation that accompanied Antenna One.

The remaining overt acts alleged in the Indictment essentially repeat the same pattern with respect to the eight other fraudulent antennas. Antennas Two, Three and Four were sold to Nautic/Air Supply Company—an undercover operation a federal law enforcement Task Force ran here in Philadelphia—on June 10, 1996, all with allegedly false documentation and false data plates, and all never authorized for any overhaul in the first place. Antenna Five was sold to Supply Air of Miami, Florida on September 19, 1996, and allegedly had affixed on it a data plate identifying it as a later version of the same antenna as well as otherwise false documentation. To the same general effect are allegations regarding Antennas Six through Nine sold to Nautic/Air Supply Company in Philadelphia in September and October of 1996.

As the Coffees allegedly used faxes, the telephone and Federal Express, eight counts allege either mail or wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343. Count X alleges trafficking in counterfeit goods, in violation of 18 U.S.C. §§ 2320 and 2, claiming that Antenna Nine was really an obsolete antenna that was made to appear to be a newer model.

Since the Indictment was returned on July 8, 1999, both the Government and defense counsel have always agreed that these cases involve unusually complex facts and voluminous documents. Thus, both sides agreed in 1999 and again in

early 2000 to long continuances in order to afford adequate preparation time, including the retention and preparation of experts. Indeed, late last month the parties submitted a third "unopposed joint motion" for a continuance, which the Government again does not oppose. Before reaching the continuance motion, however, we must first dispose of the Coffees' motions to transfer.

*Legal Standards*

Fed.R.Crim.P. 21(b) states:

For the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to that defendant or any one or more of the counts thereof to another district.

█ Motions under Rule 21(b) are addressed to the court's discretion. Although some courts maintain that there is a general rule that criminal prosecutions should remain in the district in which they were initiated, *see, e.g., United States v. Hays,* No. 96–51, 1997 WL 35666 at *3 (E.D.Pa. Jan. 29, 1997), Professors Wright and Miller believe, and we agree, that such a general rule serves to thwart the intention of Rule 21(b), *see* 2 Charles Alan Wright, *Federal Practice & Procedure* § 344 at 266 (2d ed. 1982 & Supp.2000). While the burden is on the defendant to show that transfer would serve the purpose specified in the Rule, *see* 2 *Federal Practice & Procedure* § 344 at 266–67, "[n]othing in Rule 21(b) or in the cases interpreting it place on the defendant seeking a change of venue the burden of establishing truly compelling circumstances for such a change. It is enough if, all relevant things considered, the case would be better off transferred to another district." *Matter of Balsimo,* 68 F.3d 185, 187 (7th Cir.1995) (Posner, C.J.) (quoted in 2 *Federal Practice & Procedure* § 344 at Supp. 88).

█ The factors to be considered in deciding a motion to transfer under Rule 21(b) were established in *Platt v. Minnesota Mining & Mfg. Co.,* 376 U.S. 240, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964)[1]. In *Platt,* the Court addressed a motion for transfer of venue that a corporate defendant filed in a criminal antitrust case. The Supreme Court endorsed a ten-factor test for transfer that the district court had applied. These ten factors are: (1) the location of the defendant, (2) the location of possible witnesses, (3) the location of events likely to be in issue, (4) the location of documents and records likely to be involved, (5) disruption of defendants' business unless the case is transferred, (6) expense to the parties, (7) location of counsel, (8) relative accessibility of the place of trial, (9) docket condition of each district or division involved, and (10) any other special elements which might affect the transfer, *see Platt,* 376 U.S. at 243–44, 84 S.Ct. at 771.

█ Although this test was not expressly formulated to deal with natural person defendants in a criminal case, and *Platt* itself did not discuss or analyze the elements at any length, courts faced with motions under Fed.R.Crim.P. 21(b) typically apply the *Platt* ten-part test, *see, e.g., United States v. Hays,* 1997 WL 35666 at *3 (E.D.Pa. Jan. 29, 1997), *United States v. Milikowsky,* No. 93–340, 1993 WL 367115 at *2 (E.D.Pa. Aug.31, 1993), and *United States v. Kennedy,* No. 86–159, 1986 WL 6227 at *1 (E.D.Pa. May 28, 1986). Charles A. Wright & Arthur R. Miller also endorse the *Platt* factors as the proper test, although they note that the Supreme Court's endorsement of the test was implicit, *see* 2 *Federal Practice & Procedure* § 344 at 274.

With respect to the weight to be given the various factors, Wright and Miller also state that, "It is unlikely that any one of these factors will be present by itself in a particular case. Ordinarily the various

---

1. The parties agree that the *Platt* factors constitute the proper test to apply. We note that

our Circuit has not had occasion to publish its views on this subject.

factors appear in combination, with some pointing in favor of transfer and others against transfer. It is incumbent on the court in such a case to strike a balance and decide which factors seem to be of greatest importance in that case." 2 *Federal Practice & Procedure* § 344 at 275, *see also United States v. Stephenson,* 895 F.2d 867, 875 (2d Cir.1990) (citing *Federal Practice & Procedure* ).

Not-at-all-parenthetically, it is helpful to our analysis to highlight that the Southern District of Ohio has two divisions, Western and Eastern. As Dayton is a station within the Western Division, *see* 28 U.S.C. § 115(b)(1), we throughout this Memorandum have in mind that station of that Division of the Southern District of Ohio.

*Legal Analysis*

We first note that the Government asserts, and the defendants do not dispute, that venue in this District is in the first instance proper pursuant to 18 U.S.C. § 3237(a), which provides that if an offense is started in one district and completed in another, or if the offense occurs in two districts, then the action may be brought in either district. Section 3237(a) also identifies offenses involving the use of mails or transportation in interstate commerce as "continuing offense[s]" that can be "prosecuted in any district from, through, or into which" the commerce or mail "moves".

We now canvass each of the *Platt* factors seriatim, noting for each factor the defendants' and the Government's arguments.

*Location of the Defendants*

The Coffees argue that they live in Ohio and have no contact with Pennsylvania other than the fact that their current defense lawyers are located here. The Coffees point to language from other cases to the effect that the residence of the defendant is an important element, *see, e.g., Kennedy,* 1986 WL 6227 at \*1 ("it is preferable to try a defendant in the district where he resides"). Thus, defendants conclude that this factor weighs strongly in their favor.

While the Government concedes that this factor weighs in favor of transfer, it says that it does so "only slightly". With all respect to the Government's very able counsel, this is an odd position for it to take, particularly given the economic circumstances of these defendants that are well known to the Government.

The Coffees are sufficiently poor that all have court-appointed counsel. The degree of their poverty was thrown into particular relief in the first hearing in this case on August 10, 1999, when it came to light in open court that the Coffees had, as a family, driven the 545 miles from their home in Dayton, Ohio to this court, and then spent the night *sleeping in their car* because they could not afford lodging.[2]

Even the Government concedes that the United States Treasury must bear the expense of the Coffees' travel and lodging. It has, with the United States Marshal's Service, attempted with little success [3] to find the funds to permit the Coffees to have a place to sleep before today's hearing, as we ordered on August 17, 2000. As it turns out, the Government and Marshal's Service were unable to comply with that Order, even to advance the $225.00 it cost the Coffees last night to rent two rooms in a modest downtown Philadelphia hotel.

There is no doubt that the Coffees have absolutely no tie to this district, other than the presence of the investigator's undercover company. Under all these circumstances, the first *Platt* factor weighs heavily in favor of transfer.

---

**2.** Although many papers in this case refer to the Coffees' home in "Centerville, Ohio", it turns out that Centerville is in the southern part of Dayton. *See* map for the Coffees' Zip Code, 45429, at *www.mapquest.com. See also*

U.S. Postal Service Zip Code Directory, found at *www.usps.gov/ncsc.*

**3.** See note 6, *infra.*

## Location of Possible Witnesses

The Coffees contend that all of their witnesses will come from the Ohio area. Besides themselves, it is not surprising that they would expect all possible character witnesses to be from the Dayton, Ohio area. Thomas Coffee specifically mentions twenty-two witnesses, identified in an *in camera* list submitted to the Court, and all of those witnesses are from Ohio. Jeramy Coffee has similarly identified four witnesses, all from Ohio.

The Government's witnesses are by no means limited to those from this District. In response to our Order of September 6, 2000, the Government has submitted *in camera* a list of fifty-seven witnesses, only five of whom are from this district. Seven Government witnesses are from Dayton, Ohio, and eighteen are from places as far away as Los Angeles, California (three witnesses), Kansas City, Missouri (four witnesses) and cities in Florida (five witnesses).[4]

Together, a head count of all the witnesses' inconvenience tips very much in favor of Dayton, Ohio, and thus this factor weighs heavily in favor of transfer.[5]

## Location of Events Likely To Be At Issue

Notwithstanding the Government's view that this factor is neutral, it unquestionably weighs in the Coffees' favor since the entire operation at issue was centered in Dayton, Ohio. No Coffee family member set foot in this district, and there was no communication with Pennsylvania other than the telephone calls, faxes and packages sent from Ohio to Pennsylvania.

The Government's response to the Coffees' identification of Dayton-centrality is that it is irrelevant to this analysis because there will be no need for the jury or the Court actually to view the sites of the Coffees' actions. The Government misses the point of this factor. At bottom, this factor ensures that the trial is held near where the allegedly criminal activity occurred, rather than in a district where venue has a more remote connection to the

---

4. The Government, in claiming that twenty-one witnesses from places like Syracuse, New York, Fredericksburg and Norfolk, Virginia, Waterbury, New London, and New Haven, Connecticut are "local", uses that word in no known dictionary sense other than the astronomical, as in "Mars and Venus are local planets to the Earth but Uranus and Pluto are not" or "a local group of galaxies to which ours belongs". *See* VIII *Oxford English Dictionary* 1078, def. 2.d. (2d ed.1989).

5. The Government, citing to *United States v. Atwood*, 538 F.Supp. 1206, 1208–09 (E.D.Pa. 1982) and *United States v. Haley*, 504 F.Supp. 1124, 1126–27 (E.D.Pa.1981), argues that the Coffees have failed to provide the affidavits or other evidence needed to show that their proposed witnesses—who are largely from Dayton, Ohio or its environs—would be unable or unwilling to provide testimony if the case were to be tried here, while such witnesses would be present at a trial in the Southern District of Ohio, and that consequently this factor cannot favor transfer. We cannot accept the Government's position. First, at today's hearing, defense counsel *did* represent to us, as officers of the court, that many if not all of the proposed witnesses would indeed be unwilling or unable to attend trial here in Philadelphia. Second, while we certainly agree with *Atwood* and *Haley* that consider-

ation of this factor cannot be made merely on the basis of "naked allegations" of witness inconvenience, *Haley*, 504 F.Supp. at 1126, we cannot agree that our findings must be driven by affidavits or specific showings as to each witness regarding either their specific inability to be present for trial or the testimony they would give, *but see Haley*, 504 F.Supp. at 1126 (requiring a showing of the proposed witnesses' testimony). Such a requirement is at war with the everyday experience that no reasonable lay person wants to come to federal court for any stranger, and no sane person would have such virtue—to say nothing of resources and time—to travel 545 miles to court just to be nice. Indeed, it seems to us that to require such a showing by a defendant, where none is required of the Government, would put an impermissible thumb on the balance of the *Platt* test in favor of keeping the case where the Government brought it. As we noted above, there is no presumption here that the case should remain in the original venue. In any event, we find that the defendants have made a more than adequate showing that many of their witnesses would be unable to appear in this District while they would appear in the Southern District of Ohio.

crime. While laying venue in this district is, to be sure, constitutional and in conformity with the venue statute, in truth the Coffees' actions in connection with the crimes alleged in this Indictment all took place in the Dayton, Ohio area.

This factor thus weighs in favor of transfer.

*Location of Documents*

The Coffees argue that this factor is neutral, since both sets of counsel have copies of the documents, and the documents can be transferred from Philadelphia to Ohio if need be. The Coffees also point out that the Government seized most of the documents in question in Ohio and then brought them to Philadelphia, and that it would be odd indeed to allow the Government to create venue by its act of shipping documents, especially as they can readily be shipped back, *see, e.g., United States v. Ringer,* 651 F.Supp. 636, 638 (N.D.Ill.1986), *United States v. Bein,* 539 F.Supp. 72, 74 (N.D.Ill.1982). The Coffees suggest that if there are other necessary documents still now located in Ohio, this factor may favor transfer, but they do not identify such documents.

The Government contends that this factor weighs heavily against transfer. The Government points out that the 1996 and 1999 search warrants led to the seizure of a literal roomful of documents, constituting in fact the entirety of all of TCMG's records. Further, "weeks" have been spent packaging this material and sending it first from Ohio to an offsite location in Philadelphia and then to its current location at the United States Attorney's Office. Repacking these papers and sending it off to Ohio, the Government argues, would require an "enormous" expenditure of Government resources.

There is no doubt that the documents at issue are voluminous and that they are now located in Philadelphia. Moreover, while there would be an expense to ship these back to Ohio, it would not be logistically difficult; they were, after all, found there and shipped here in the first instance.

It is hard to take seriously the Government's estimate of an "enormous" expense in simply shipping the documents to the United States Attorney's Office in Dayton, Ohio. Businesses on a daily basis move far more documents to destinations of greater distances than the 545 miles here. On the other hand, there is much merit to the Coffees' contention that the Government's moving of the documents from their home in Ohio to Philadelphia should not permit the Government to bootstrap its desire for venue here.

This factor is thus neutral.

*Disruption of the Defendant's Business*

Thomas Coffee argues that he is currently employed as a "remodeler/handyman" in Ohio under the company name "Coffee Enterprises, Inc.". He argues that he will have to stop working during the trial if it is held in Philadelphia, whereas in Ohio he will be able to work after court or during breaks. Thus, Coffee *père* argues that this reality favors transfer. Thomas Coffee also notes that the "marginal" nature of his business should not make this factor stand any less in his favor, *see United States v. Haley,* 504 F.Supp. 1124, 1128 (E.D.Pa.1981) (holding that this factor favored transfer when one of the defendants was merely planning to pump gas at night during trial, on the basis that "[d]efending criminal charges should not include the penalty of financial ruin where the trial might be conducted properly and legally in a forum near defendants' homes and businesses").

At today's hearing, defense counsel elaborated that some family members assist in Thomas Coffee's enterprises. Other family members also hold jobs in retail stores where they could work nights and weekends during trial.

The Government argues that this factor weighs only slightly, if at all, in favor of transfer. The Government notes that trial in any location will interfere with a busi-

ness, *see Bloom,* 78 F.R.D. at 609. Instead, the Government argues that the defendants should be required to show that the conduct of the trial here, as opposed to in Dayton, will disrupt their business substantially more than by simply having to defend criminal charges, *see, United States v. McDade,* 827 F.Supp. 1153, 1190 (E.D.Pa.1993). The Government also contends that the defendants have not tendered evidence to show the specific nature of their employment, nor have they made a showing that they are in such dire straits that a two-week interruption in their work would create such problems as to justify a transfer. The Government rightly notes that the *Haley* case Thomas Coffee cited included not only a gas-pumping defendant, but also defendants who were facing "financial ruin". The Government further expresses its doubt that the "remodeling/handyman" business could go on after trial each day.

Certainly as to Thomas Coffee, this factor weighs in favor of transfer. While we have less information regarding employment effects on Naomi, Bradley, or Jeramy Coffee, being in Philadelphia for trial would unquestionably impede any effort to obtain employment or maintain the part-time employment they have in Dayton that we learned about at the hearing.

Additionally, the Government ignores the fact that more than two weeks' disruption will be involved here. The Coffees must, after all, prepare for the defense of their cases, and this necessarily will involve many long sessions with their lawyers.

Thus, being 545 miles from home will unquestionably have a materially adverse effect on Thomas Coffee's work, and plainly will not help the employment picture for the other family members as well.

*Expenses to the Parties*

Related to our analysis of the first factor, the Coffees contend that travel from Dayton, Ohio to Philadelphia and lodging before and during trial will present a ma-jor financial hardship to them both in terms of time and expenses they cannot begin to afford.

Counsel for Thomas Coffee and Jeramy Coffee represented at the hearing that none of their twenty-eight anticipated witnesses will or can advance the cost of travel to, and lodging in, Philadelphia. While at the hearing the Government staked out the ludicrous position that we should presume these witnesses will advance such costs in the vague hope that the Government may one day reimburse them, this proposition is too preposterous to require further comment. *See* note 5, *supra.*

The Government stresses that it, too, will have expenses if the case is transferred. While we have not been provided with quotations of relative travel costs from the Government's travel agent, it is clear from the Government's witness list that such expenses will be high if trial is in Dayton or Philadelphia. The Government admitted as much as the hearing.

But even if these costs were slightly higher in Dayton, our resolution of this factor would not change. Our colleague, Judge Shapiro, has properly noted that "[w]hile the government has greater resources with which to pay travel and lodging expenses, public funds are to be safeguarded." *United States v. Atwood,* 538 F.Supp. 1206, 1209 (E.D.Pa.1982). While Judge Shapiro's statement as a generalization is, of course, true, in the criminal context it is in our view unpersuasive. The United States of America has, for all practical purposes, unlimited financial resources to bring to bear. Unlike the Coffees, the Government can, and does, mint money.

Here the relevant financial resources can by no stretch of the imagination be likened to, say, those in play in *United States v. Microsoft.* To the contrary, the Coffees are poor people who are confronted with the massive power of the United States Government. In such circumstances, the public fisc must take second

place to the fundamental due process rights of impecunious defendants like the Coffees. For them, the prospect of making a long-distance telephone call to their lawyers constitutes a major financial decision. We doubt that any member of the huge law enforcement team arrayed in this prosecution has ever so much as given a thought to the cost of any telephone call.

Interestingly, the Assistant United States Attorney represents that the General Counsel for the United States Marshal's Service has opined that 18 U.S.C. § 4285 bars the Service from paying *any* of the Coffees' expenses beyond one-way travel to this district.[6] The prosecutor assures us, however, that he is doing everything possible to obtain authorization from the United States Department of Justice for the payment of the thousands of dollars that the Coffees will need for their travel and lodging for the trial and, presumably, preparation for it.

This aspect of the expense factor also weighs in favor of transfer. Against the Government's utter failure to assure compliance with the modest cost associated with our August 17, 2000 Order, the Assistant United States Attorney has offered nothing more than a soothing hope that somehow he will be able to obtain the funds that the General Counsel of the United States Marshal's Service has told him he may not obtain from that part of the Department of Justice. Without giving it any close analysis, it would seem at a minimum to implicate rather serious due process concerns to require the Coffees to live in their car during the weeks of the trial. In short, we simply will not subject these impecunious defendants to such absurd conditions on the will-o'-the-wisp that somehow, somewhere, someone from some part of the United States Department of Justice will have the grace to provide the money to lodge the defendants in Philadelphia for several weeks.

*Location of Counsel*

With respect to the defendants' counsel, as the Coffees will have new counsel in the Southern District of Ohio who will also be paid from the public fisc, this is a neutral factor from the defense point of view. Indeed, the Coffees all had lawyers in Dayton, Ohio before the Indictment was returned.

While it is doubtless true that the present Assistant United States Attorney would have to travel to southern Ohio to prosecute this case, he will not be subject to the risks just discussed of where the money will come from to pay for his lodging in Dayton. In an era when lawyers routinely practice and try cases all over America, we give little weight to whatever inconvenience this particular Assistant United States Attorney may suffer for spending a few weeks in Dayton, Ohio.

This factor is thus neutral.

*Relative Accessability of Place of Trial*

Both sides agree that this is a neutral factor between this courthouse and that in Dayton, Ohio and so we shall not discuss it any further.

*Docket Condition of Each District or Division*

This factor tips in favor of the United States District Court for the Southern Dis-

6. The Assistant United States Attorney has provided us with the memorandum that the USMS General Counsel sent him, in which that counsel cites to three district court cases that have held that only one-way transport is authorized (that is, neither return transport nor lodging can be provided, though one-way transport and subsistence on the road can be). The General Counsel also included a citation to a 1990 District of Maryland case which held that it is a criminal violation of the Anti–Deficiency Act for a judge to order the USMS to pay transport expenses not authorized by 18 U.S.C. § 4285, *see United States v. Nave*, 733 F.Supp. 1002, 1003 (D.Md.1990) (holding that under the Anti–Deficiency Act, 18 U.S.C. § 1341, a court "should not" order the expenditure of Government funds in the absence of statutory authority for such expenditure, and that were a court to do so, the judge "could conceivably" be open to criminal prosecution under 31 U.S.C. § 1350, "a situation that might mildly amuse some, but which ought to be avoided, if possible").

trict of Ohio. Perhaps because that district is unburdened by the rigor of such programs as Operation Ceasefire, the most recent statistics show that the median disposition time of criminal cases in the Southern District of Ohio is 7.8 months rather than the 8.6 months in this District. *See 1999 Federal Court Management Statistics* at 57, 95 (Administrative Office of the United States Courts, Statistics Division). The Southern District of Ohio is thus ten districts faster than this District, according to the same statistics. *Id.*[7]

*Special Considerations*

Although the Government contends that the reported cases ordering transfer were more extraordinary than that here, this argument has little, if any, merit.

First, as we have done here, courts that decide to transfer cases feel an obligation to explain what is, after all, an unusual event in federal criminal practice. While doubtless there are more compelling cases than this one, the other *Platt* factors applied here rather heavily tilt either in favor of transfer (six factors) or are, at worst, neutral (three).

Taken together, this really is not a close case (as the Government suggests), and indeed one wonders why the Government brought this prosecution in this district in the first place. In response to our question on this point at the hearing, the Government assured us that this was not a tactic to maximize the pressure for guilty pleas, but rather was the result of the agencies' Task Force being located in Philadelphia.

But the bureaucratic convenience of the Government is subject to Rule 21(b), and here it must give way to the principles of fairness embedded in that Rule. We therefore without hesitation grant the defendants' motions. An Order follows.

*ORDER*

AND NOW, this 8th day of September, 2000, upon consideration of Thomas Coffee's motion to transfer venue (docket number 86) and his motion to amend the motion to transfer venue (docket number 99), which the Government opposes, Naomi Coffee's motion to adopt motions filed by her co-defendants (docket number 100), Bradley Coffee's motion to adopt motions filed by his co-defendants (docket number 101), Jeramy Coffee's motion to adopt motions filed by his co-defendants (docket number 97), TCMG, Inc.'s motion to adopt motions filed by its co-defendants (docket number 98), and after a hearing this day, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. Thomas Coffee's motion to transfer venue and his motion to amend the motion to transfer venue are GRANTED;

2. Naomi Coffee's motion to adopt motions filed by her co-defendants is GRANTED;

3. Bradley Coffee's motion to adopt motions filed by his co-defendants is GRANTED;

4. Jeramy Coffee's motion to adopt motions filed by his co-defendants is GRANTED;

5. TCMG, Inc.'s motion to adopt motions filed by its co-defendants is GRANTED;

6. The Clerk shall TRANSFER this case to the United States District Court for the Southern District of Ohio, Western Division.

---

7. The AO does not in its annual publications break down its statistics by divisions within a district. We therefore do not know about the Dayton station of the Western Division.